419 So.2d 1071 (1982)
DEPARTMENT OF TRANSPORTATION, State of Florida, Petitioner,
v.
William M. NEILSON, etc., et al., Respondents.
HILLSBOROUGH COUNTY, Petitioner,
v.
William M. Neilson, Etc., et al., Respondents.
CITY OF TAMPA, etc., Petitioner,
v.
William M. NEILSON, etc., et al., Respondents.
Nos. 61029, 61042 and 61053.
Supreme Court of Florida.
September 14, 1982.
*1073 Alan E. DeSerio, Appellate Atty., Ella Jan P. Davis, Trial Atty., and H. Reynolds Sampson, Gen. Counsel, Tallahassee, for Dept. of Transp.
Joseph W. Clark, Charles P. Schropp and Raymond T. Elligett, Jr. of Shackleford, Farrior, Stallings & Evans, Tampa, for Hillsborough County.
Bernard C. Silver, Asst. City Atty., Tampa, for City of Tampa.
Joel D. Eaton of Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin, Miami, for respondents.
Robert A. Ginsburg, Dade County Atty., and Roy S. Wood, Jr., and Craig H. Coller, Asst. County Attys., Miami, for Metropolitan Dade County, amicus curiae.
OVERTON, Justice.
These are three petitions to review one decision of the Second District Court of Appeal reported as Neilson v. City of Tampa, 400 So.2d 799 (Fla. 2d DCA 1981). The case involves an interpretation of "operational-level" as distinguished from "judgmental planning-level" functions of government as discussed in Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla. 1979). Specifically, the case concerns a governmental entity's failure to properly control, by traffic control devices, and to properly design or upgrade, a multistreet intersection. We find direct conflict[1] and have jurisdiction. Art. V, § 3(b)(3), Fla. Const. We quash the instant decision and hold that the failure to install traffic control devices and the failure to upgrade an existing road or intersection, as well as the decision to build a road or roads with a particular alignment, are judgmental, planning-level functions and absolute immunity attaches.
The complaint in this action alleged that on August 20, 1975, Patricia Neilson was driving her motor vehicle on West Interbay Boulevard, at or near its intersection with South Westshore Boulevard in the City of Tampa. As the Neilson vehicle passed through the intersection, it collided with a truck owned by Belcher Oil Company. Mrs. Neilson and her passengers, her husband and children, sustained serious injuries. The Neilsons thereafter sued Belcher Oil, the Department of Transportation, Hillsborough County, and the City of Tampa.[2] *1074 As against the governmental entities involved in this action, the Neilsons alleged negligence in (1) the initial design and construction of the intersection as a roadway, (2) failing to install adequate traffic control signals and devices, (3) designing, constructing and maintaining confusing traffic control devices at the intersection, and (4) failing to warn motorists through the placement of additional traffic control devices that the intersection was hazardous.
The trial court initially dismissed the governmental entities from the suit on the ground they were immune from this type of action. The Second District Court of Appeal in Neilson v. Department of Transportation, 376 So.2d 296 (Fla. 2d DCA 1979), remanded the case to the trial court for reconsideration in view of our intervening decision in Commercial Carrier. Upon remand, the trial court again dismissed the action against all three governmental entities, finding that the conduct was a judgmental, planning-level function under Commercial Carrier. On appeal the second time, the district court again reversed, holding that the negligence alleged by the Neilsons fell under the operational level of decision making. The court said that "`once a government decides to act, whether out of obligation or free choice, it must act responsibly and reasonably under the existing circumstances, and in accordance with acceptable standards of care and common sense.' [O]nce the planning decision was made to intersect the roads, the governmental entities could not negligently design or construct the facility with impunity." Neilson, 400 So.2d at 800 (quoting in part from Collom v. City of St. Petersburg, 400 So.2d 507, 508 (Fla. 2d DCA 1981)). In effect, the district court held that once the decision is made to have roads intersect, it is for the jury to determine whether the road could have been designed better or whether traffic control devices are necessary. We disagree, and quash the district court's holding under the circumstances of this case.
The issue here concerns claimed omissions and negligent acts which subject a governmental entity to liability because of its placement of traffic control devices, its decisions concerning the initial plan and alignment of roads, and its failure to improve or upgrade roads or intersections.
In addressing the specific question presented here, the petitioning governmental entities argue that the building of roads, the expansion or alteration of intersections, and the placement of traffic control devices are judgmental, planning-level functions which are immune from suit. The entities contend that the clear weight of the cases arising from the district courts of appeal support this conclusion. They also assert that if the Second District Court of Appeal's analysis in the instant case is adopted, governmental entities will be substantially impeded in constructing roadways unless they can afford to build "Cadillac" roadways. Further, they argue that no matter how a governmental entity builds a road, the actions taken by such entity would be subject to review by a judge or jury.
*1075 In response, the Neilsons contend that for any governmental decision to come within the category of judgmental, planning-level decision-making, such decision must be one of a broad and basic policy nature. They argue that Commercial Carrier did not immunize all discretionary decisions of governmental entities. Rather, they say that government is immune from tort liability only for those broad discretionary decisions made at basic policy-making levels. This, in their view, would include decisions as to the appropriation of money for highway construction, whether a highway is to be two- or four-laned, whether a highway is to be limited or open access, where a highway is to intersect with other streets, what type of construction materials will be used, and the route the highway will take. Apart from these types of decisions, the Neilsons assert, governmental entities are not immune from liability for discretionary decisions made at a level where these broad policies, once established, are implemented. Under this category would come decisions concerning the design of the highway in its entirety and the selection of appropriate traffic control devices. In this regard, the Neilsons say that no logical distinction exists between the initial failure to install a stop sign or to paint the word "stop" on the pavement at an intersection and the decision not to maintain or replace a missing stop sign or repaint the worn letters on the roadway surface. Finally, they contend that the district court's decision is proper due to the governmental entities' failure to comply with uniform traffic control standards and criteria in accordance with the provisions of sections 335.075 and 316.131 (renumbered 316.0745), Florida Statutes (1975). These statutory provisions, they argue, render the construction and design of the subject roadway operational-level decisions which are actionable.
In answering the question presented here it is necessary to return to our decision in Commercial Carrier. In that case, Justice Sundberg, in a thorough analysis of the law in this area, distinguished between that part of the sovereign immunity doctrine involving negligent tortious conduct waived by section 768.28, Florida Statutes (1977), and that part of the sovereign immunity doctrine identified at times as official or governmental immunity not waived by the statute. In the latter, absolute immunity attaches to "policy-making, planning, or judgmental governmental functions." 371 So.2d at 1020. The underlying premise for this immunity is that it cannot be tortious conduct for a government to govern. Our decision recognized that there are areas inherent in the act of governing which cannot be subject to suit and scrutiny by judge or jury without violating the separation of powers doctrine. We reiterate the reason for this immunity as quoted in Commercial Carrier from Evangelical United Brethren Church v. State, 67 Wash.2d 246, 254, 407 P.2d 440, 444 (1965):
The reason most frequently assigned is that in any organized society there must be room for basic governmental policy decision and the implementation thereof, unhampered by the threat or fear of sovereign tort liability, or, as stated by one writer, "Liability cannot be imposed when condemnation of the acts or omissions relied upon necessarily brings into question the propriety of governmental objectives or programs or the decision of one who, with the authority to do so, determined that the acts or omissions involved should occur or that the risk which eventuated should be encountered for the advancement of governmental objectives." Peck, The Federal Tort Claims Act, 31 Wash.L.Rev. 207 (1956).
Commercial Carrier, 371 So.2d at 1019 (emphasis added).
Commercial Carrier, established that discretionary, judgmental, planning-level decisions were immune from suit, but that operational-level decisions were not so immune. In applying these principles to the facts in that case, we held that the failure to properly maintain an existing traffic control device was an operational decision and suit could be filed against the governmental entity. Because the line between judgmental, planning-level decisions and operational-level decisions is not easy to define, the four-pronged *1076 test set forth in Evangelical United Brethren Church[3] was adopted to assist in distinguishing between these separate levels of decision-making.
Recognizing the severe criticism from courts and commentators concerning the "governmental-proprietary" and "special duty-general duty" analysis of sovereign immunity law as it applied to municipalities, the Court in Commercial Carrier dropped those distinctions in favor of applying the judgmental, planning-level versus operational-level analysis to municipalities. 371 So.2d at 1016. Municipalities were held to be "unequivocally included" within the ambit of section 768.28. "Were it the intent of the legislature merely to make the law of municipal sovereign immunity applicable to the state, its agencies and political subdivisions, there would have been no need to include municipalities within the operation of the statute." Id. This holding was reaffirmed in Cauley v. City of Jacksonville, 403 So.2d 379 (Fla. 1981).
Since Commercial Carrier, numerous district courts of appeal of this state have rendered decisions concerning whether a particular governmental function is a judgmental, planning-level function or an operational-level function. A number of cases have concerned the placement of traffic control devices and the construction of public roadways.
The majority of such decisions have held that immunity attaches, concluding that traffic control methods constitute a judgmental, planning-level decision. A.L. Lewis Elementary School v. Metropolitan Dade County, 376 So.2d 32, 34 (Fla. 3d DCA 1979), held "that the fixing of particular traffic zones, installation of traffic signals and pedestrian control devices are discretionarily policy matters, planning or judgment governmental features, and as such cannot be the subject of traditional tort law liability... ." Ingham v. Department of Transportation, 399 So.2d 1028 (Fla. 1st DCA 1981), held that constructing the road with a curve, determining the position, shape and size of the median, and failing to provide adequate signaling were activities which constitute judgmental, planning-level functions and were not operational in character. Banta v. Rosier, 399 So.2d 444 (Fla. 5th DCA 1981), held that allegations concerning an improperly designed intersection pled matters which were within the judgmental, planning level of decision making. Payne v. Palm Beach County, 395 So.2d 1267 (Fla. 4th DCA 1981), held that the failure to extend a road and the construction of a guardrail are classic examples of the type of judgmental, planning-level decisions within the protected sphere of sovereign immunity. Romine v. Metropolitan Dade County, 401 So.2d 882 (Fla. 3d DCA 1981), review denied, 412 So.2d 469 (Fla. 1982), held that a county's failure to control an intersection with a more sophisticated device than the one actually used could not give rise to liability because the decision to use a more sophisticated device was of a judgmental, planning-level nature. Ralph v. City of Daytona Beach, 412 So.2d 875, 878 (Fla. 5th DCA 1982), held that the city was not liable for a failure to regulate traffic on the beach because "[w]hether to allow, restrict, or otherwise regulate vehicular traffic on the beach requires a decision which involves a basic governmental policy, program, or objective... ." Finally, Department *1077 of Transportation v. Vega, 414 So.2d 559 (Fla. 3d DCA 1982), held that the placement or non-placement of traffic control signals or pedestrian control signals is a judgmental, planning-level function unless mandated by a particular statute.
Ferla v. Metropolitan Dade County, 374 So.2d 64 (Fla. 3d DCA 1979), cert. denied, 385 So.2d 759 (Fla. 1980), is a more difficult case to explain. The court in Ferla held that the setting of a speed limit by the county and the construction of a causeway with a narrow traffic lane represented judgmental, planning-level decisions which could not be the subject of a tort claim. At the same time, however, the district court held that the design and construction of a median strip along the causeway represented an operational act which was actionable. The court likened the determination of the configuration of the median to the activity involved in properly maintaining existing traffic control devices. In effect, the court held that the design of the median is not immune from suit, but that immunity applies to the design of the width and number of lanes.
A related case expresses the view that the placement of warning-type signs is operational in nature. Department of Transportation v. Webb, 409 So.2d 1061 (Fla. 1st DCA 1981). In that case, the placement of railroad crossing signs was determined to be an operational-level function and not immune from suit.
As stated, the issue to be decided in this case is whether decisions concerning the installation of traffic control devices, the initial plan and alignment of roads, or the improvement or upgrading of roads or intersections may constitute omissions or negligent acts which subject governmental entities to liability. We answer the question in the negative, holding such activities are basic capital improvements and are judgmental, planning-level functions. We also reject suggestions that we should modify our Commercial Carrier decision because of recent decisions in other jurisdictions on the subject matter.
With regard to the installation and placement of traffic control devices, we find the argument that such placement is exclusively the decision of traffic engineers and, as such, an operational-level function, to be without merit. Many municipalities and counties make these decisions, including even the installation of single traffic lights, within the ambit of their legislative function. Moreover, traffic control is strictly within the police power of the governmental entity. Questioning this function necessarily raises the issue of the government's proper use of its police power. In Wong v. City of Miami, 237 So.2d 132 (Fla. 1970), it was determined that the city could not be held accountable for how the police force was deployed. By analogy to Wong, the failure to deploy patrolmen to congested intersections to control traffic would not subject a governmental entity to negligence liability. In our view, decisions relating to the installation of appropriate traffic control methods and devices or the establishment of speed limits are discretionary decisions which implement the entity's police power and are judgmental, planning-level functions.
We also hold that the decision to build or change a road, and all the determinations inherent in such a decision, are of the judgmental, planning-level type. To hold otherwise, as expressed by the dissent, would supplant the wisdom of the judicial branch for that of the governmental entities whose job it is to determine, fund, and supervise necessary road construction and improvements, thereby violating the separation of powers doctrine. This is not to say, however, that a governmental entity may not be liable for an engineering design defect not inherent in the overall plan for a project it has directed be built, or for an inherent defect which creates a known dangerous condition. To illustrate a situation in which liability may arise in the former instance, a highway could be constructed with a bridge spanning a waterway. If the bridge supports are negligently designed and give way, causing injury, an action could be maintained because there is an engineering design defect not inherent in *1078 the overall plan approved by the governmental entity. If, however, the alleged defect is one that results from the overall plan itself, it is not actionable unless a known dangerous condition is established. Illustrations of inherent defects include the construction of a two-lane highway where traffic use indicates four-laning is necessary or the construction of a curved road where a straight road would be more appropriate. Such decisions as the location and alignment of roads, the width and number of lanes, and the placing of traffic control devices are not actionable because the defects are inherent in the overall project itself. The fact that a road is built with a sharp curve is not in itself a design defect which creates governmental liability. If, however, the governmental entity knows when it creates a curve that vehicles cannot safely negotiate the curve at speeds of more than twenty-five miles per hour, such entity must take steps to warn the public of the danger.
The failure to so warn of a known danger is, in our view, a negligent omission at the operational level of government and cannot reasonably be argued to be within the judgmental, planning-level sphere. Clearly, this type of failure may serve as the basis for an action against the governmental entity.
As stated in Commercial Carrier, and reaffirmed here, the failure to properly maintain existing traffic control devices and existing roads may also be the basis of a suit against a governmental entity. We caution, however, that the maintenance of a particular street or intersection means maintenance of the street or intersection as it exists. It does not contemplate maintenance as the term may sometimes be used to indicate obsolescence and the need to upgrade a road by such things as widening or changing the means of traffic control.
We further reject the contention that the failure to comply with standards and criteria for design, construction, and maintenance of public roads and highways established pursuant to sections 335.075 and 316.131 (renumbered 316.0745), Florida Statutes (1975), subjects governmental entities to suit. These statutorily directed standards were established by the legislature to set forth standards for governmental entities to follow when building new roads or changing and upgrading present roads or intersections. The legislature had no intent to mandate that all governmental entities immediately upgrade and improve all existing roads to comply with these standards.
Issues concerning engineering design defects establishing a known hazard are more fully addressed in our simultaneous decisions in City of St. Petersburg v. Mathews, and City of St. Petersburg v. Collom, 419 So.2d 1082 (Fla. 1982).
In this case, the Neilsons have sought to hold a governmental entity liable for failing to properly design a roadway intersection and maintain suitable traffic control devices. As we read it, the Neilsons' complaint alleges the failure to properly "design" the intersection, "maintain" traffic control devices, and "warn of hazardous conditions" through the installation of traffic control devices. In our view, the manner in which these allegations are made points to a purported failure by the governmental entity to upgrade and reconstruct the intersection and install additional traffic control devices to meet present needs. In this respect, neither the original alignment of the roadway nor the failure to install traffic control devices at the intersection is actionable. This conclusion is consistent with the four-pronged Evangelical test followed by this Court in Commercial Carrier. If the complaint had alleged a known trap or dangerous condition for which there was no proper warning, such an allegation would have stated a cause of action. The allegations of the complaint in this proceeding, however, concern upgrading the intersection and installing traffic control devices rather than the duty of a governmental entity to warn of a dangerous intersection.
*1079 Because, in this case, we have clarified the application of certain legal principles set forth in Commercial Carrier, we believe that the Neilsons should now have an additional opportunity to file an amended complaint. For the reasons expressed, we quash the decision of the district court of appeal in Neilson v. City of Tampa, 400 So.2d 799 (Fla. 2d DCA 1981), and remand with directions that the trial court allow the Neilsons the opportunity to amend their complaint within twenty days, and, if they fail to so amend, the trial court judgment should then be reinstated.
It is so ordered.
ALDERMAN, C.J., BOYD and McDONALD, JJ., concur.
EHRLICH, J., dissents.
SUNDBERG, J., dissents with an opinion, with which ADKINS, J., concurs.
SUNDBERG, Justice, dissenting.
The Court today in a trilogy of opinions, including this opinion,[1] attempts to clarify and advance the development of the law of sovereign immunity waiver in this state spawned by section 768.28, Florida Statutes (1975), as interpreted in Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla. 1979). In a laudable effort to simplify the distinction between those acts of governmental agencies which still enjoy immunity and those which do not, it occurs to me that the majority has simply exchanged one set of result descriptive labels for another. Hence, the irreconcilable results among the several district courts of appeal are not harmonized, but rather the confusion is compounded. The enigma is now shrouded in mystery. Because I believe it need not be so, I respectfully dissent.
To take up where we left off in Commercial Carrier, we must first remind ourselves of the holding of that decision and the principles upon which the holding was based. First the holding:
So we, too, hold that although section 768.28 evinces the intent of our legislature to waive sovereign immunity on a broad basis, nevertheless, certain "discretionary" governmental functions remain immune from tort liability. This is so because certain functions of coordinate branches of government may not be subject to scrutiny by judge or jury as to the wisdom of their performance.
371 So.2d at 1022 (emphasis added). From the holding of the case, then, it is apparent that a finding of immunity is the exception rather than the rule.[2] This conclusion flows not merely from the express language of the decision, but was necessarily required because unlike the Federal Tort Claims Act there is no express exemption within the provisions of section 768.28 for discretionary acts of governmental agencies or their employees. The judicial gloss supplied by this Court should be narrowly rather than expansively invoked.
Furthermore, the exemption from waiver of immunity engrafted upon section 768.28 by Commercial Carrier concerns not all but only certain "discretionary" governmental functions. Only "planning level" functions, requiring basic policy decisions, were intended to be exempt from the legislature's waiver of governmental immunity, not all discretionary acts carried out by government. The analysis of Johnson v. State, supra note 2, was specifically adopted by the Court in Commercial Carrier as a means to isolate those discretionary functions of government which should be insulated from tort liability. That analysis is not a mechanistic *1080 one, but rather looks to the reasons for granting immunity to the governmental entity. It requires the Court "`to find and isolate those areas of quasi-legislative policymaking which are sufficiently sensitive to justify a blanket rule that courts will not entertain a tort action alleging that careless conduct contributed to the governmental decision.'" 371 So.2d at 1021.
Every other jurisdiction which has adopted the rationale of Johnson v. State has found, when confronted with our issue, that if a dangerous condition is created by a highway design, then a duty to at least warn a motorist arises. Thus, in Stevenson v. State Department of Transportation, 290 Or. 3, 619 P.2d 247 (1980), the failure of the state to shield a traffic light to prevent a misleading effect presented a jury question as to negligence, and such a decision was not protected within the ambit of governmental discretion. The court squarely placed the burden of establishing immunity on the state's shoulders, rejecting any broad grant of immunity:
Like virtually every other activity, both planning and design, as well as maintenance of roads, frequently require the making of decisions which do not involve the making of public policy; for example, the decision whether to make a safety fence two feet rather than three feet high or the decision to first remove the snow from Street A rather than from Street B. These decisions involve the use of "discretion" in the sense that a choice must be made but they do not involve the use of "discretion" in the sense that a policy decision is required.
Id. at 10-11, 619 P.2d at 252. The "level of administration" was also considered as an indication of whether a policy choice had been made. Id. at 14, 619 P.2d at 254. Likewise, the placement of highway signs and no passing stripes at the entrance of a campground was an operational, not a policy or planning, decision. State v. I'Anson, 529 P.2d 188 (Alaska 1974). In another case, a highway barrier made unsafe by several resurfacings subjected the state to liability. Even though the decision to resurface may have involved policy, after that decision failure to safely execute the plan was an operational deficiency. Costa v. Josey, 83 N.J. 49, 415 A.2d 337 (1980). Following Johnson v. State, the Utah Supreme Court held the state must adequately warn motorists when it created a hazardous condition caused by digging a wash across a new, uncompleted road. Placement of road signs to warn of a hazard did not require a basic policy evaluation. Carroll v. State Road Commission, 27 Utah 2d 384, 496 P.2d 888 (1972). Finally, California in applying Johnson v. State to a case like ours held that in spite of a specific statutory grant of immunity for design defects, once the state was placed on notice by a history of injuries at an intersection with no turn lane, a continuing duty to supervise the safe operation of the highways could subject the state to liability because of changed conditions. Baldwin v. State, 6 Cal.3d 424, 99 Cal. Rptr. 145, 491 P.2d 1121 (1972). No court which has followed Johnson v. State has held as the majority does today.
In any such analysis the governmental agency must additionally demonstrate that a "considered" decision was undertaken. Johnson v. State, 69 Cal.2d 782, 794 n. 8, 73 Cal. Rptr. 240, 249 n. 8, 447 P.2d 352, 361 n. 8. A considered decision is one which consciously balances risks and advantages. Id. As a consequence it will be difficult, if not impossible, to determine the issue of immunity on a motion to dismiss. The sparsity of the record to support a summary judgment in favor of the state was a basis for reversal in Bellavance v. State, 390 So.2d 422 (Fla. 1st DCA 1980), cert. denied, 399 So.2d 1145 (Fla. 1981). In that case the trial court had entered summary judgment against plaintiffs who alleged damages resulting from the negligent release by the state of a person committed to Northeast Florida State Hospital. In reversing, the district court of appeal held that the act of the state in releasing the patient did not rise to that level of "basic policy decisions" which would call for judicial restraint and that the state did not demonstrate that the personnel involved, after consciously balancing risks *1081 and advantages, made a considered decision in releasing the patient. The Bellavance court properly relied upon and applied the Johnson analysis.
In the instant case involving a motion to dismiss the complaint, there was likewise an absence of proof that the governmental agencies consciously balanced the risks and alternatives inherent in the design of the intersection and then made a considered decision. Even if such evidence were in this record, there can surely be no contention that once on notice of the alleged dangerous and hazardous condition of the intersection, the governmental authorities made a conscious decision to maintain the intersection in that condition without warning to motorists. See Baldwin v. State.[3]
Hence, even assuming the original intersection design was immune from judicial scrutiny,[4] the existence of the hazardous condition, allegedly known to the defendants, which became manifest through actual operation of the public improvement can create liability for negligent failure to remedy or warn. Why should this hazard be permitted to exist after knowledge any more than a hazard created by the collapse of pavement through an act of God? Surely the state should be required to rectify what it has put wrong through its own design.[5]
For the reasons expressed, I would approve the decision of the district court of appeal.
ADKINS, J., concurs.
NOTES
[1] We find that the instant case conflicts with the following decisions: Ralph v. City of Daytona Beach, 412 So.2d 875 (Fla. 5th DCA 1982); Romine v. Metropolitan Dade County, 401 So.2d 882 (Fla. 3d DCA 1981), review denied, 412 So.2d 469 (Fla. 1982); Ingham v. Dept. of Transp., 399 So.2d 1028 (Fla. 1st DCA 1981); Banta v. Rosier, 399 So.2d 444 (Fla. 5th DCA 1981); Payne v. Palm Beach County, 395 So.2d 1267 (Fla. 4th DCA 1981); A.L. Lewis Elementary School v. Metropolitan Dade County, 376 So.2d 32 (Fla. 3d DCA 1979). Another case, Ferla v. Metropolitan Dade County, 374 So.2d 64 (Fla. 3d DCA 1979), cert. denied, 385 So.2d 759 (Fla. 1980), conflicts in part and is consistent in part with the instant case.
[2] The two pertinent paragraphs of the complaint alleged as follows:

17. That at all times hereinafter mentioned and at the time of the incident complained of, South West Shore, West Inter Bay, Plant Avenue and Shell Drive all merged into a common intersection in the City of Tampa, which said intersection was dangerous and hazardous to motorists proceeding from either Plant Avenue, South West Shore, Inter Bay or Shell Drive because of the angles of approach which the aforesaid streets made when entering said known intersection so that said intersection was dangerously and defectively designed as a roadway; was dangerous and hazardous to motorists traversing the streets merging into said intersection; that said streets merging into said intersection were not adequately controlled with traffic control signs and devices, to-wit: red, green and yellow traffic signals positioned in such a manner as to govern the flow of traffic to said intersections in an orderly manner or blinking and flashing lights clearly indicating to the motorist approaching said intersection that same was a hazardous and dangerous intersection and governing the flow of traffic accordingly and such necessary traffic control devices so as to alert the motorist using said intersecting streets of the nature of the dangerous and defective roadway and intersection.
18. That [at] all times hereinafter mentioned and at the time of the incident complained of, the Defendants, DEPARTMENT OF TRANSPORTATION, an agency of the State of Florida, HILLSBOROUGH COUNTY, a political subdivision of the State of Florida and the CITY OF TAMPA, a municipal corporation, and each of them, individually, jointly or concurrently, designed, maintained and constructed that certain intersection where the incident complained of occurred which said intersection the traffic control devices placed thereon were so constructed, designed and maintained so as to confuse motorists using the roads at said intersection thereby exposing them to the hazard of meeting on-coming traffic and the Defendants, each of them, knew or with the exercise of reasonable care should have known of the dangerous and hazardous condition of said intersection but failed to warn motorists using said roadway of said condition and were thereby, each of them, negligent and careless, and said negligent condition caused or contributed to cause the incident herein complained of, and with reasonable care, the aforesaid Defendants should have provided the aforesaid traffic control devices for the reason aforesaid, the failure of which was negligent and caused or contributed to the cause of the injuries hereinabove and hereinafter alleged.
[3] Evangelical United Brethren Church v. State, 67 Wash.2d 246, 407 P.2d 440 (1965), established a preliminary test of four questions. If these questions could be answered in the affirmative, the challenged act should be classified as a discretionary planning or judgmental function immune from suit. The four questions are as follows:

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?
67 Wash.2d at 255, 407 P.2d at 445.
[1] Department of Transportation v. Neilson, 419 So.2d 1071 (Fla. 1982); Ingham v. Department of Transportation, 419 So.2d 1081 (Fla. 1982); and City of St. Petersburg v. Collom, 419 So.2d 1082 (Fla. 1982).
[2] Compare the statement from Johnson v. State, 69 Cal.2d 782, 798, 73 Cal. Rptr. 240, 251, 447 P.2d 352, 363 (1968), which case was so heavily relied upon in Commercial Carrier: "`when there is negligence, the rule is liability, immunity is the exception.'" (Quoting from Muskopf v. Corning Hospital Dist., 55 Cal.2d 211, 219, 11 Cal. Rptr. 89, 94, 359 P.2d 457, 465 (1961).)
[3] In paragraph 18. of the complaint it is alleged that the condition of the intersection was dangerous and hazardous and that the defendants knew or through the exercise of reasonable care should have known of that condition.
[4] Because notice of a hazardous condition is alleged, we do not face the issue of whether highway design by itself warrants immunity. Courts following Johnson have not held design sacrosanct. See I'Anson; Stevenson. Notice of hazard arising from changed condition was required in Baldwin v. State only because design defects were specifically given immunity by statute.
[5] I observe here that the cases cited in the footnote to the opinion in City of St. Petersburg v. Collom, 419 So.2d 1082 (Fla. 1982), to support a holding of liability against the city there are completely supportive of the view expressed here.