438 So.2d 415 (1983)
Patricia L. BRYAN, Appellant,
v.
STATE of Florida, DEPARTMENT OF BUSINESS REGULATION, et al., Appellees.
No. AN-24.
District Court of Appeal of Florida, First District.
September 12, 1983.
Rehearing Denied October 14, 1983.
*416 E.C. Deeno Kitchen, Brian S. Duffy and Robert King High, Jr., of Ervin, Varn, Jacobs, Odom & Kitchen, Tallahassee, and Vincent Philip Nuccio, Tampa, for appellant.
Janice G. Scott, Staff Atty., Dept. of Business Regulation, Tallahassee, for appellees.
NIMMONS, Judge.
This is an appeal by plaintiff Patricia L. Bryan from an order dismissing her amended complaint with prejudice as to the defendant State of Florida Department of Business Regulation (DBR). We find that the trial court erred in dismissing the amended complaint and reverse.
Patricia Bryan filed suit on behalf of the estate of her deceased son, Joseph David Bryan, in a wrongful death action brought against several defendants including DBR for damages arising out of a fatal accident on October 25, 1979, in which the plaintiff's decedent fell down an elevator shaft while attempting to exit from a stalled elevator on campus at Florida State University (F.S.U.).

NEGLIGENCE: SUFFICIENCY OF COMPLAINT
In determining whether the plaintiff stated a cause of action for negligence against DBR, our analysis begins with the essential facts alleged in the amended complaint. Of course, in considering a motion to dismiss for failure to state a cause of action, factual allegations of the complaint must be taken as true and all reasonable inferences supportive of plaintiff's case should be assumed. Orlando Sports Stadium, Inc. v. State ex rel. Powell, 262 So.2d 881, 883 (Fla. 1972); Florida Coast Bank of Broward County v. Monarch Dodge, Inc., 430 So.2d 607, 609 (Fla. 4th DCA 1983); and East Caribbean Development & Investment Corp. v. K-K Auto Service, Inc., 435 So.2d 364 (Fla. 4th DCA 1983).
The decedent was an 18-year-old student at F.S.U. where he had been residing in Smith Hall, a campus dormitory, for more than a month prior to his death. On the day of the accident, decedent and a fellow resident of Smith Hall, Timothy E. Schomer, entered the subject elevator at the third floor intending to travel to the ninth floor. As the elevator was proceeding towards the ninth floor, the decedent, who was situated in a back corner of the elevator holding onto the back handrail and a side handrail, leaned forward. As he did so, the resulting force caused the side handrail to move slightly inward and away from the side emergency-exit door to which the side handrail was bolted. Since the emergency-exit door was not latched, such door was allowed to move inward and that movement broke the electrical contacts located in the circuit box on the outside of the elevator car causing the car to abruptly stop between the sixth and seventh floors. After the handrail was released, the car made some brief up and down movements as a *417 result of the remaking and rebreaking of electrical contacts. After several minutes, decedent and Schomer, who were the only occupants of the elevator car, decided to attempt to escape from their unanticipated confinement.
Decedent was able to open the elevator car doors with no difficulty. There was a distance of approximately 18 inches between the platform (the floor of the elevator) and the soffit (the top of the stationary door frame at the corridor). Decedent sat on the platform, extended his legs through the space between the soffit and the platform and slid feet first out of the car toward the sixth floor landing. As he did so, his head struck the interior portion of the soffit throwing him off balance. He dropped to the sixth floor landing and fell back into the hoistway (the elevator shaft) through a rectangular void or space in the door frame having a width the same as the hoistway doors (the elevator doors at the corridor) and a height of about 42 inches, the distance from the bottom of the platform guard to the landing. Decedent fell down the hoistway approximately 70 feet into the pit (that portion of the hoistway below the first floor landing). He sustained massive head injuries from which he died the following day.
Appellant brought suit against the elevator company that designed, manufactured, and installed the elevator, the elevator company with which the Board of Regents contracted for maintenance of the elevator, the Board of Regents as the owner and operator of Smith Hall and DBR. The amended complaint was dismissed only as to DBR.
The order of dismissal found that the amended complaint failed to state a cause of action for negligence. The trial court noted that it was not reaching the issue of sovereign immunity which had been raised by DBR. Since we find that the amended complaint did state a cause of action for negligence, we will address the issue of sovereign immunity later in our opinion to determine whether the court's dismissal order can be sustained on that basis.
The case against DBR is predicated upon negligence in the performance of its statutory duty of inspection of the subject elevator. Chapter 399, Florida Statutes (1979), imposed certain requirements upon DBR's Division of Hotels and Restaurants regarding safety of elevators and other designated lifting or lowering equipment. A review of some of the Chapter 399 provisions is appropriate for purposes of our analysis.[1]
Although elevators, such as the subject elevator, installed before July 1, 1971, could be used without being rebuilt to comply with the Elevator Safety Code,[2] nevertheless, such elevators "shall be maintained in a safe operating condition and shall be subject to inspections and tests required by s. 399.08." Section 399.03, Florida Statutes (1979). Section 399.02 also provided that the owner or his "agent" shall be responsible for the safe operation and proper maintenance of his elevator. Another section imposed the duty upon the division to appoint "the necessary state elevator inspectors," made provision for the issuance by the division of a certificate of competency as a prerequisite to the appointment of such inspectors and further provided for the eligibility for such certificates to be determined by written and practical examinations given under the division's supervision. Section 399.04.
Section 399.08 required that elevators must be inspected by an inspector at least once a year. It further empowered the division to order the discontinuance of the use of an elevator whenever it was determined *418 "that in the interest of the public safety such elevator, or any part or appliance thereof, is out of order and in an unsafe condition contrary to the requirements of this chapter ... ." until it has been satisfactorily repaired so that the elevator is "in a safe and proper condition as required by this chapter." Similarly, Section 399.06(2) provided for the inspector to require the discontinuance of an elevator pending repairs where the elevator was found to be "dangerous to life and property."
There was also the requirement that the division issue a certificate for display in the elevator when the elevator was deemed to be in conformance with Chapter 399. Section 399.08(3).
Finally, Section 399.10 provided that, "It shall be the duty of the division to enforce the provisions of this chapter."
There can be no question that DBR had the duty to periodically inspect the subject elevator to determine whether it was in safe condition and to order that its operation be discontinued if determined unsafe. Moreover, an obvious purpose for such inspections and certifications was to protect users, including decedent, from unreasonable risk of injury caused by an unsafe elevator.[3] As previously indicated, since the subject elevator was installed prior to July 1, 1971, Section 399.03(3) provided that it could be used "without being rebuilt to comply with the requirements of the Elevator Safety Code." However, this does not mean that DBR was excused from inspecting and testing pre-1971 elevators to assure safe operating condition inasmuch as such was expressly required by Section 399.03(3).
The amended complaint alleged a number of defects in the operation and construction of the elevator. Among other things, the complaint alleged: (a) in view of the relationship between the left side hand rail and the side emergency exit door, as previously described above, only slight force on the handrail was necessary to break the electrical contacts in the circuit box on the outside of the elevator car causing the car to stop; (b) the elevator had no warnings, instructions or information posted to advise passengers what to do or not to do in case of elevator malfunction; (c) the elevator car doors could readily be opened from inside the car and the hoistway doors likewise could readily be opened from inside the hoistway and that such was the only apparent means of escape by occupants of the stalled elevator; (d) that DBR knew that persons had been injured, some fatally, in previous elevator accidents involving other but similar elevators to that involved in the instant case, where such persons were passengers in elevators stalled above a landing, opened the hoistway doors, jumped to the landing and fell back down the hoistway; (e) that the elevator platform guard which was the width of the hoistway door opening was insufficient in that it extended below the platform a distance of only approximately 24 inches; (f) that DBR knew that the previous accidents referred to above could have been prevented by the presence of a platform guard exceeding 24 inches in vertical length; and (g) that the subject accident could have been prevented by the presence of such a platform guard.[4]
The amended complaint alleges that DBR inspected the elevator on July 11, 1979, and certified that it was in safe and proper condition. Plaintiff avers that DBR's failure to require correction of the alleged deficiencies constituted negligence which was the legal cause of the subject fatal accident.
DBR argues that it was not reasonably foreseeable that a passenger such as decedent would attempt to escape from *419 the stalled elevator as he did. We are of the view that the allegations of the amended complaint are such that the question of foreseeability should not have been determined on the motion to dismiss. As was stated in Crislip v. Holland, 401 So.2d 1115, 1117 (Fla. 4th DCA 1981), petition for rev. den. 411 So.2d 380 (Fla. 1981):
[T]he plaintiff must demonstrate that he is within the zone of risks that are reasonably foreseeable by the defendant. The liability of the tortfeasor does not depend upon whether his negligent acts were the direct cause of the plaintiff's injuries, as long as the injuries incurred were the reasonably foreseeable consequences of the tortfeasor's conduct. Concord Florida, Inc. v. Lewin, 341 So.2d 242 (Fla. 3rd DCA 1976). If the harm that occurs is within the scope of danger created by the defendant's negligent conduct, then such harm is a reasonably foreseeable consequence of the negligence. The question of foreseeability and whether an intervening cause is foreseeable is for the trier of fact. Gibson v. Avis Rent-A-Car System, 386 So.2d 520 (Fla. 1980).
We conclude that the amended complaint was sufficient to state a cause of action in negligence against DBR.

SOVEREIGN IMMUNITY
We next address the question of whether the trial court's order of dismissal should be sustained on the grounds of sovereign immunity, an issue raised by DBR but pretermitted by the trial court.
In order to resolve this question, it is necessary to determine whether elevator inspections by DBR are "operational-level" or "judgmental, planning-level" functions of government as discussed in Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla. 1979). See also City of St. Petersburg v. Collom, 419 So.2d 1082 (Fla. 1982). Unlike a number of the recent cases, we do not deal here with a governmental entity's maintenance of traffic controls or its creation of a "known dangerous condition" on government-owned property or property on which the governmental entity has a right-of-way or easement. See City of St. Petersburg v. Collom, supra; Department of Transportation v. Neilson, 419 So.2d 1071 (Fla. 1982); Ingham v. State Department of Transportation, 419 So.2d 1081 (Fla. 1982); Perez v. Department of Transportation, 435 So.2d 830 (Fla. 1983); State Department of Transportation v. Kennedy, 429 So.2d 1210 (Fla. 2nd DCA 1983).
In carving out of Section 768.28, Florida Statutes, an exception for the statutory waiver of sovereign immunity, the court in Commercial Carrier observed:
[E]ven absent an express exception in section 768.28 for discretionary functions, certain policy-making, planning or judgmental governmental functions cannot be the subject of traditional tort liability. [371 So.2d at 1020]
* * * * * *
Planning level functions are generally interpreted to be those requiring basic policy decisions, while operational level functions are those that implement policy. [371 So.2d at 1021]
* * * * * *
[A]lthough section 768.28 evinces the intent of our legislature to waive sovereign immunity on a broad basis, nevertheless certain "discretionary" governmental functions remain immune from tort liability. This is so because certain functions of coordinate branches of government may not be subjected to scrutiny by judge or jury as to the wisdom of their performance. [371 So.2d 1022]
We echo the above-quoted observation of the Supreme Court that the legislature evinced an intent to waive sovereign immunity on a broad basis, a legislative step authorized by Article X, Section 13, of the Florida Constitution. In fact, Section 768.28 is devoid of any exceptions of the kind which the judiciary has struggled to articulate and apply over the past several years.
In Commercial Carrier the Supreme Court suggested the use of a four-prong test borrowed from Evangelical United Brethren Church v. State, 67 Wash.2d 246, *420 407 P.2d 440 (1965), in determining whether a particular act should be regarded as planning or operational. Such test has not proved to be of significant help in a number of cases in which the courts have been called upon to determine whether a Commercial Carrier sovereign immunity exception should be found. See Neumann v. Davis Water and Waste, Inc., 433 So.2d 559, f.n. 7 at p. 562 (Fla. 2nd DCA 1983); Carter v. City of Stuart, 433 So.2d 669 (Fla. 4th DCA 1983); Wallace v. Nationwide Mutual Fire Insurance Co., 376 So.2d 39 (Fla. 4th DCA 1979). Nevertheless, we attempt now to utilize that test: (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? Assuming that this question asks whether Chapter 399 elevator inspections constitute a basic governmental policy, program or objective, we are inclined to answer this question in the affirmative. (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program or objective? We believe that, regardless of whether this question contemplates (a) negligent inspection or (b) nonnegligent inspection, as the questioned act, omission or decision, the question should be answered in the negative and that, instead, it is one which would not change the course or direction of the policy, program or objective. Compare Bellavance v. State, 390 So.2d 422, 424 (Fla. 1st DCA 1980). (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? Most assuredly, in the day-to-day handling of inspections, judgment calls will have to be made by those conducting the inspections. However, we do not believe that the elevator inspections contemplated by Chapter 399 involve the kind of policy decisions or judgments to which this question is addressed. We, therefore answer this question in the negative. (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to make the challenged act, omission or decision? We answer this question in the affirmative with the understanding that, properly translated, the question is whether DBR had the authority to inspect elevators.
Commercial Carrier instructed that if all four of the Evangelical United Brethren questions are answered in the affirmative, the act may be classified as a discretionary planning-level function but where one or more questions call for a negative answer, further inquiry may be necessary. Frankly, just as our sister court of the Second District found in Neumann v. Davis Water and Waste, Inc., supra, we find the attempted application of the above four-prong test ill-suited as an aid in resolving the sovereign immunity issue in the instant case. To us, the effort involves the application of the proverbial square peg to the round hole.
The determination of whether to administer safety inspections for elevators and to certify their condition was in our view, a planning-level determination that was made for DBR by the legislature. The subsequent performance of inspection and certification is an operational-level activity implementing that policy. As stated in Trianon Park Condominium v. City of Hialeah, 423 So.2d 911, 913 (Fla. 3rd DCA 1982):
Once the City undertook to inspect, review and certify construction, it was obligated to do so reasonably and responsibly in accordance with acceptable standards of care... . [T]he City's inspection and certification of buildings within its borders is an operational level activity, for which it may be subject to tort liability under Section 768.28, Florida Statutes.
In Department of Transportation v. Neilson, supra, at 1075, Justice Overton succinctly stated the rationale for the Supreme Court's recognition that a certain part of the sovereign immunity doctrine, that part identified at times as "official or governmental immunity," was not waived by Section 768.28:
The underlying premise for this immunity is that it cannot be tortious conduct for a government to govern. Our decision *421 [Commercial Carrier] recognized that there are areas inherent in the act of governing which cannot be subject to suit and scrutiny by judge or jury without violating the separation of powers doctrine.
After thoroughly reviewing Commercial Carrier and its progeny, it is apparent to us that elevator safety inspections and certifications required by the applicable statutory provisions for the protection of elevator users cannot reasonably be held to be the kind of policy-making, planning or judgmental governmental functions which our Supreme Court says are excepted from the legislature's broad waiver of sovereign immunity mandate expressed in Section 768.28.
We take the liberty of noting here that the policy of waiving sovereign immunity for negligence by governmental agencies in the performance of statutory safety inspections such as in the case at bar is certainly questionable. See Wallace v. Nationwide Mutual Fire Ins. Co., supra. However, ours is not to encroach upon the legislative prerogative of determining policy. Rather, we are limited by the hand that has been dealt us and must give full effect to the legislative intent expressed in Section 768.28. The Commercial Carrier exceptions afford no relief therefrom in the instant case.
The order of dismissal is reversed and the case is remanded for further proceedings consistent with this opinion.
JOANOS and ZEHMER, JJ., concur.
NOTES
[1] Unless otherwise specified herein, references in this opinion to Chapter 399 or its various subsections shall mean the provisions as they appeared in Chapter 399, Florida Statutes (1979). Chapter 399 was substantially revised in 1981 by Chapter 81-120, Laws of Florida, and was also one of the subjects of the Regulatory Sunset Act, Chapter 81-318, Laws of Florida. In 1983, the legislature, notwithstanding the Sunset Act, readopted and revised Chapter 399. The 1981 and 1983 legislative changes are of no consequence to the case sub judice as the alleged negligence occurred prior to the October, 1979, accident.
[2] Section 399.02(2) provided for the division's adoption of an Elevator Safety Code.
[3] The "general duty  special duty" dichotomy no longer has vitality in negligence actions against the state or its political subdivisions. See Commercial Carrier Corp. v. Indian River Cty, 371 So.2d 1010, 1015 (Fla. 1979); cf. Rupp v. Bryant, 417 So.2d 658, 662 (Fla. 1982).
[4] The amended complaint includes several other allegations regarding deficiencies in the condition of the elevator and negligence of DBR. We do not deem it necessary to discuss each and every such allegation. Our omission of such other allegations should not be read by the parties as any indication that such other allegations are deficient.