587 So.2d 1292 (1991)
DEPARTMENT OF TRANSPORTATION, Petitioner,
v.
Loretta KONNEY, etc., et al., Respondents.
PALM BEACH COUNTY, Petitioner,
v.
Loretta KONNEY, etc., et al., Respondents.
Nos. 75180, 75241.
Supreme Court of Florida.
October 10, 1991.
Michael B. Davis, of Davis Hoy Carroll & Isaacs, P.A., West Palm Beach, for petitioner, State of Florida Dept. of Transp.
Christopher D. Mauriello, Asst. County Atty., West Palm Beach, for petitioner, Palm Beach County.
Richard L. Martens and Fletcher N. Baldwin, III of Boose Casey Ciklin Lubitz Martens McBane & O'Connell, West Palm Beach, for respondents.
Robert A. Butterworth, Atty. Gen. and Franz Eric Dorn, Deputy Asst. Atty. Gen., Tallahassee, amicus curiae for The Office of Atty. Gen.
Susan H. Churuti, County Atty., Clearwater, amicus curiae for Pinellas County.
John J. Copelan, Jr., County Atty., Alexander Cocalis, Chief Trial Counsel and Stephanie W. Werner, Asst. County Atty., Fort Lauderdale, amicus curiae for Broward County.
Robert R. Warchola, Asst. County Atty., Tampa, amicus curiae for Hillsborough County.
*1293 Charlene V. Edwards, Asst. City Atty., Tampa, amicus curiae for City of Tampa.
V. Lynn Whitfield, West Palm Beach, amicus curiae for City of West Palm Beach.
Phillip C. Gildan of Nason, Gildan, Yeager, Gerson & White, P.A., West Palm Beach, amicus curiae for The Academy of Florida Trial Lawyers.
OVERTON, Justice.
We have for review State, Department of Transportation v. Konney, 551 So.2d 613 (Fla. 4th DCA 1989), in which the Fourth District Court of Appeal held that, in a claim against the State of Florida, Department of Transportation (State) and Palm Beach County (County) for damages resulting from an accident at the intersection of a county and a state road, the trial court could properly admit "evidence showing that a `particular traffic control device should have been installed.'" The district court effectively held that the failure to upgrade the intersection by installing a flashing beacon was a proper claim and not protected by the doctrine of sovereign immunity. We find conflict with Department of Transportation v. Neilson, 419 So.2d 1071 (Fla. 1982), and Ingham v. State, Department of Transportation, 419 So.2d 1081 (Fla. 1982).[1] For the reasons expressed, we quash the district court's holding and remand for entry of a judgment in favor of petitioners.
On June 23, 1983, Douglas Konney was driving south on State Road 710 (S.R. 710), and George Funk was driving west on County Road 809 (C-809). This suit arose out of an automobile accident which occurred when their vehicles collided at the intersection of S.R. 710, controlled by the Department of Transportation, and C-809, controlled by Palm Beach County. These two roads intersect in a manner that creates two acute angles and two obtuse angles, rather than four right angles.[2]
Traffic on S.R. 710 has the right of way at its intersection with C-809. Southbound traffic on S.R. 710, which is the direction that Konney was traveling, would encounter the following three warning signs before that road intersected with C-809: (1) a side road sign at 1,740 feet; (2) a 45-mile-per-hour sign, reducing speed from 55 miles per hour, at 1560 feet; and (3) at 650 feet, a crossroad sign. Westbound traffic on C-809, which was the direction Funk was traveling, was governed by a stop sign at the main intersection; 488 feet in advance of this stop sign was a "Stop Ahead" warning sign. In addition, the road surface on C-809 was painted with appropriate markings in reflective paint. The speed limit on C-809 was 55 miles an hour.
A Game and Freshwater Fish Commission officer was driving westbound on C-809, directly behind the Funk vehicle. The officer noted that Funk was speeding up and slowing down for no apparent reason. As the Funk vehicle approached the intersection of C-809 and S.R. 710, the officer noted that it was traveling at a speed of 45 to 55 miles per hour. When the officer began to slow down to make a right-hand turn, he observed the Konney vehicle traveling south on S.R. 710. Although there was a stop sign, the Funk vehicle continued straight ahead and entered the intersection without ever applying its brakes. As Konney approached the intersection, he apparently saw the Funk vehicle because he locked his brakes, leaving 35 to 41 feet of skid marks prior to impact with the Funk vehicle. The commission officer called the police and emergency assistance. Konney was killed in the collision; Funk died later in the hospital. The passenger in the Funk vehicle survived.
Konney's estate brought a wrongful death action against the State and the County, alleging that: (1) they were negligent in failing to install a flashing beacon at the intersection; (2) the County should have installed rumble strips on C-809 on *1294 the approach to the intersection; and (3) the location and type of signs on each roadway were improper. Konney presented expert testimony that explained the need for a flashing beacon and rumble strips at this intersection. Evidence was also presented that established that from 1973 to 1977 no accidents occurred at this intersection and that from 1978 to 1982 there were twelve accidents. The State presented statistical evidence to show that the number of accidents during 1978 through 1982 was below average for a rural intersection.
Konney emphasized to the jury the State's and County's failure to install a flashing beacon at the intersection and the County's failure to install rumble strips on C-809. The jury returned a verdict in favor of Konney and against each of the defendants, finding the County 60% liable and the State 40% liable. The jury assessed damages at $260,000.
On appeal, the Fourth District Court of Appeal affirmed. In doing so, the district court noted our decision in City of St. Petersburg v. Collom, 419 So.2d 1082 (Fla. 1982), in which we held that
once a governmental entity creates a known dangerous condition which may not be readily apparent to one who could be injured by the condition, and the governmental entity has knowledge of the presence of people likely to be injured, then the governmental entity must take steps to avert the danger or properly warn persons who may be injured by that danger.
Id. at 1086 (emphasis omitted). In its decision, the Fourth District Court of Appeal applied our Collom decision and concluded: "The trial judge properly admitted evidence showing a flashing beacon should have been installed at the intersection to warn drivers in a manner more consistent with the safety of the traveling public." Konney 551 So.2d at 615.
In a series of cases, we have distinguished between government liability for failure to properly plan, align, and upgrade roads or intersections, including the installation of traffic control devices, and the government's duty to maintain existing facilities and its liability for failure to warn of a known dangerous condition. In the first instance, we have consistently held that decisions concerning the initial plan, road alignment, traffic control device installation, or the improvement of roads and intersections are not matters which would subject a governmental entity to liability, because these activities are basic capital improvements and are judgmental, planning-level functions. Neilson; Ingham; Perez v. Department of Transp., 435 So.2d 830 (Fla. 1983).
In Neilson, we held that "decisions relating to the installation of appropriate traffic control methods and devices or the establishment of speed limits are discretionary decisions which implement the entity's police power and are judgmental, planning-level functions." 419 So.2d at 1077. We emphasized that the term "maintenance" is not a term that may be used in this context to indicate the need to upgrade a road by such things as widening or changing the means of traffic control. Id. at 1078. Our decision under those circumstances was necessary to protect the separation-of-powers doctrine.[3] We noted that it was not a judicial function to determine what was suitable road construction or when funds must be spent to upgrade existing roads. Regarding the second situation, we further explained in Neilson and Collom that failure to warn of a known dangerous condition may serve as a basis for an action against a governmental entity because it is a negligent omission at the operational level of government. Id.
The issue in the instant case is whether the installation of a flashing beacon at the intersection of S.R. 710 and C-809 was a planning-level decision required to upgrade the intersection because of increased traffic or a necessary device due to a known dangerous condition at the time this intersection *1295 was created, i.e., an operational-level decision. In the first instance, sovereign immunity would prohibit recovery under the principles of Neilson and its progeny, while in the second instance recovery would be allowed under Collom.
Both the State and the County assert that the Fourth District Court of Appeal's decision conflicts with Neilson and Ingham. They argue that this action is barred from suit by sovereign immunity because the decision of whether to install a flashing beacon is a planning-level decision as opposed to an operational-level decision. The State and the County contend that there is no causal nexus between the road signs and the accident. They assert that, if the district court's analysis is adopted, then judges and juries will be able to determine the adequacy of traffic control signals at all intersections. The State and the County argue that, no matter how a governmental body builds a road, its actions will always be subject to a judge's or jury's review. Konney, on the other hand, asserts that, since there was no proper warning of a known dangerous condition, the Fourth District Court of Appeal's decision is consistent with our decision in Collom, particularly in view of the fact that the State and County concede that any intersection is an inherently dangerous condition.
We find that Neilson and Ingham control under the circumstances of this case. Although we accept the proposition that every intersection may be inherently dangerous, we reject the conclusion reached by the district court that these circumstances give the judicial branch the authority to determine the type of traffic control devices utilized at intersections. While intersections may be inherently dangerous, the type and extent of traffic control devices vary greatly, from rules that control the right of way to multilane traffic control signals. This Court and the district courts of appeal have established the principle that traffic control methods and the failure to upgrade intersections with traffic control devices are judgmental, planning-level decisions, which are not actionable. Trianon Park Condominium Ass'n v. City of Hialeah, 468 So.2d 912 (Fla. 1985); Ingham; Neilson; Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla. 1979); A.L. Lewis Elementary School v. Metropolitan Dade County, 376 So.2d 32 (Fla.3d DCA 1979); Ferri v. City of Gainesville, 362 So.2d 345 (Fla. 1st DCA 1978). We reaffirmed this principle in Palm Beach County Board of County Commissioners v. Salas, 511 So.2d 544 (Fla. 1987), where we held that sovereign immunity did not apply under circumstances where a maintenance crew, in the course of maintaining an intersection, had deactivated and blocked a left-turn lane. In that instance, we stated that "[a]lthough the county's initial decision of whether to utilize a left turn signal was a planning-level decision, once that decision was made, the county's later decision to deactivate that signal and block off the left turn lane for road maintenance was an operational-level decision." Id. at 546 (emphasis added).
Additionally, Konney asserts that the unusual geometry of the intersection reduced the driver's line of sight and increased the dangerousness of the intersection. Furthermore, Konney argues that the inherent dangerousness arising from the unusual geometry of the intersection, coupled with its rural setting, limited line of sight, absence of artificial illumination, and lack of roadside businesses made this intersection a condition requiring the highest level of warning. We find no merit to this argument.
We find that the geometry of this intersection had nothing to do with this particular accident. As Konney's counsel acknowledged in oral argument, given the directions in which these two vehicles were traveling, the drivers' line of sight for each vehicle was better as they approached this intersection than it would have been had the intersection been at right angles. Furthermore, we note that the effect of the unusual geometry of the intersection was *1296 not presented to the jury as a factor that caused this accident. What Konney did emphasize to the jury was the lack of a flashing beacon and rumble strips at the intersection. Interestingly, the evidence presented at trial reflects that no accidents occurred at this intersection between 1973 and 1977. That fact establishes that this intersection was not a known dangerous condition when it was created, distinct from any other rural highway intersection controlled by a stop sign.
This case has been presented to this Court on the basis of a failure of the duty to warn of a known dangerous condition; however, we find that the true basis for Konney's assertion is that the State and the County were negligent for failing to upgrade this intersection. This is clear from how the case was presented to the jury. Konney does not argue that there was a need for a flashing beacon at this intersection when this road was first constructed or that there is a need for a flashing beacon at all rural intersections of state and county roads. In fact, Konney made this point to the jury by asserting that, once fatal accidents occurred between 1978 and 1982, these accidents mandated upgrading this intersection to include a flashing beacon and rumble strips.
The facts of this case are controlled by our decisions in Neilson and Ingham and particularly the statement that the "failure by the governmental entity to upgrade and reconstruct the intersection and install additional traffic control devices to meet present needs" was not actionable. Neilson, 419 So.2d at 1078. The decision of whether to upgrade this intersection is a judgmental, planning-level function, to which absolute immunity applies. To do otherwise would allow the judicial branch to infringe upon the legislative and executive function of deciding where tax dollars should be allocated for our roads and highways.
Accordingly, we quash the decision of the district court of appeal and direct that this case be remanded for entry of a judgment in favor of petitioners.
It is so ordered.
McDONALD and GRIMES, JJ., concur.
BARKETT, J., concurs specially with an opinion.
KOGAN, J., concurs specially with an opinion, in which SHAW, C.J., and BARKETT, J., concur.
SHAW, C.J., concurs in result only.
*1297 
*1298 BARKETT, Justice, specially concurring.
I concur specially because of the controlling case of Department of Transportation v. Neilson, 419 So.2d 1071 (Fla. 1982). However, I am persuaded that the Court was wrong in that case, and I agree totally with Justice Sundberg's dissenting opinion therein.
KOGAN, Justice, specially concurring.
I agree with the majority that Department of Transportation v. Neilson, 419 So.2d 1071 (Fla. 1982), controls the present case, even though I would not necessarily reach the same result if Neilson were being decided today. I write separately to emphasize that the Neilson Court's sovereign-immunity analysis develops a critical distinction that is directly relevant to the arguments raised in the present case, particularly in light of Neilson's companion case, City of St. Petersburg v. Collom, 419 So.2d 1082 (Fla. 1982).
The majority correctly notes that the Neilson Court found that the decision whether or not to use specific traffic control measures generally is a police-power function that is conducted at the discretionary planning level and thus is immune. Neilson, 419 So.2d at 1077. However, the Neilson Court also went on to acknowledge two exceptions. The first, which is not relevant to the present case, is that liability still would attach if the government's decision is implemented in such a way that an unintended defect is created or maintained.[4]Id. at 1077-78.
The second exception, however, is directly relevant to the matters at hand and deserves discussion. This second Neilson exception deals with those situations in which a governmental unit knowingly maintains a peril so hazardous and so inconspicuous to foreseeable plaintiffs that it virtually constitutes a trap. In such situations, liability still may exist, since the government (like any other entity or person) is not privileged to maintain a trap. This conclusion flows from a close reading of both Neilson and Collom.
The Neilson Court made the following observation:
Such decisions as the location and alignment of roads, the width and number of lanes, and the placing of traffic control devices are not actionable because the defects are inherent in the overall project itself. The fact that a road is built with a sharp curve is not in itself a design defect which creates governmental liability. If, however, the governmental entity knows when it creates a curve that vehicles cannot safely negotiate the curve at speeds of more than twenty-five miles per hour, such entity must take steps to warn the public of the danger.

419 So.2d at 1078 (emphasis added). The Neilson Court went on to conclude:
As we read it, the Neilsons' complaint alleges the failure to properly "design" the intersection, "maintain" traffic control devices, and "warn of hazardous conditions" through the installation of traffic control devices. In our view, the manner in which these allegations are made points to a purported failure by the governmental entity to upgrade and reconstruct the intersection and install additional traffic control devices to meet present needs. In this respect, neither the original alignment of the roadway nor the failure to install traffic control devices at the intersection is actionable... . If the complaint had alleged *1299 a known trap or dangerous condition for which there was no proper warning, such an allegation would have stated a cause of action.

Id. (emphasis added). It is the proviso in this last sentence that is of special relevance to the issues at bar.
The meaning of this language was further illuminated by Collom, a companion case the Court issued the same day it released Neilson. In Collom, the Court directly and expressly addressed the meaning of the second Neilson exception. Id. at 1086. The Court stated:
We hold that when a governmental entity creates a known dangerous condition, which is not readily apparent to persons who could be injured by the condition, a duty at the operational-level arises to warn the public of, or protect the public from, the known danger. The failure to fulfill this operational-level duty is, therefore, a basis for an action against the governmental entity.
Id. at 1083. The Collom Court went on to explain:
[A] governmental entity may not create a known hazard or trap and then claim immunity from suit for injuries resulting from that hazard on the grounds that it arose from a judgmental, planning-level decision. When such a condition is knowingly created by a governmental entity, then it reasonably follows that the governmental entity has the responsibility to protect the public from that condition, and the failure to so protect cannot logically be labelled a judgmental, planning-level decision. We find it unreasonable to presume that a governmental entity, as a matter of policy in making a judgmental, planning-level decision, would knowingly create a trap or a dangerous condition and intentionally fail to warn or protect the users of that improvement from the risk.
Id. at 1086 (emphasis added).
The analysis set forth in Neilson and elaborated in Collom admittedly is not crystal clear. The Court, for example, interchangeably used the terms "trap," "hazard," "known dangerous condition," and "dangerous condition." In common usage, these terms clearly connote a varying level of severity. In particular, "trap" imports a far more serious peril than does "dangerous condition," especially in light of the fact (noted by the majority) that every intersection can be considered dangerous.
However, while this loose usage of the English language may seem confusing, I believe the Court's true meaning is evident both from the overall thrust of the analysis (quoted above) and the facts upon which Collom was based. The Collom opinion, for example, concluded that liability could exist notwithstanding sovereign immunity where a local government constructs water drainage systems in such a way that unsuspecting persons are sucked into them, to their deaths. Collom, 419 So.2d at 1084-87. Such a situation obviously constitutes a very serious peril.
I believe these factors indicate the Neilson and Collom Court was talking about a known hazard so serious and so inconspicuous to a foreseeable plaintiff that it virtually constitutes a trap. In such circumstances, a duty arises either to warn foreseeable plaintiffs or to take actions to diminish the peril. Neilson; Collom.
The crucial question, then, is whether the present case falls within the second exception announced in Neilson, since the decision to install traffic control devices otherwise is immune. I agree that Neilson compels the result reached by the majority, although this is a result I am not entirely happy with.
Nevertheless, I must emphasize that this does not necessarily mean that a roadway hazard never can fall within the second Neilson exception. If the facts of the present case were more serious and the danger more inconspicuous, I would conclude that liability could exist under the second Neilson exception. I am not persuaded by the Department of Transportation's *1300 argument that this Court's prior "trap" cases typically deal with threats posed to children, not threats to adults or threats caused by traffic problems. While threats to children may be more common, there is no question that an adult as well as a child can fall victim to a serious, inconspicuous hazard that a governmental unit has knowingly maintained. Our opinion in Collom itself dealt with an adult woman who, together with her child, was sucked into a drainage ditch. Collom, 419 So.2d at 1084.
Moreover, we previously have noted that a traffic hazard may become so severe as to become actionable. Id., at 1086; Neilson, 419 So.2d at 1078. Thus, it is entirely possible that governmental units knowingly can maintain a traffic condition that would fall within the second Neilson exception and thus would not be immune.
For the foregoing reasons, I agree that Neilson bars the present claim. I write this separate opinion only to explain my understanding of the applicable law and its relevant exceptions.
SHAW, C.J., and BARKETT, J., concur.
NOTES
[1] We have jurisdiction. Art. V, § 3(b)(3), Fla. Const.
[2] A diagram of the intersection is attached as Appendix 1.
[3] Art. II, § 3, Fla. Const.
[4] As an example, Neilson said there would be liability if a government agency builds a bridge but the bridge's supports contain an unintended defect, so that the bridge gives way under the weight of a car. Obviously, this is not really an "exception" at all, since the defect was not intended, was not a part of any planning-level function, and thus was created at the operational level. Department of Transp. v. Neilson, 419 So.2d 1071, 1077-78 (Fla. 1982). Our opinion in Slemp v. City of North Miami, 545 So.2d 256 (Fla. 1989), also can be understood as a "defect" case in which liability arose because of failure to maintain and operate stormwater pumps properly, resulting in flooding of a plaintiff's property.