468 So.2d 936 (1985)
Azor J. EVERTON, Jr., et al., Petitioners,
v.
Marion WILLARD, et al., Respondents.
No. 63440.
Supreme Court of Florida.
April 4, 1985.
Rehearing Denied May 22, 1985.
*937 Rick A. Mattson of Mattson, McGrady and Todd, St. Petersburg, for Everton.
Daniel C. Kasaris of Yanchuck, Thompson, Young and Berman, St. Petersburg, for Trinko.
Mark E. Hungate, James B. Thompson and Chris W. Altenbernd of Fowler, White, Gillen, Boggs, Villareal and Banker, Tampa, for respondents.
Paul A. Rowell, Gen. Counsel, and Michael J. Alderman, Asst. Gen. Counsel, Tallahassee, amicus curiae for State of Florida Dept. of Highway Safety and Motor Vehicles.
OVERTON, Justice.
This cause is before us on petition to review a decision of the Second District Court of Appeal reported as Everton v. Willard, 426 So.2d 996 (Fla. 2d DCA 1983). The issue concerns a law enforcement officer's discretionary police power authority to make or not make an arrest and whether a decision not to take an individual into custody constitutes a basic judgmental or decision-making function that is immune from tort liability. The district court in the instant case held that an officer's decision under this discretionary authority is covered by basic governmental sovereign immunity that precludes liability for such a decision. We find direct conflict with the decision of the Fifth District Court of Appeal in Huhn v. Dixie Insurance Co., 453 So.2d 70 (Fla. 5th DCA 1984). We have jurisdiction, article V, section 3(b)(3), Florida Constitution, and we approve the decision of the Second District Court of Appeal in the instant case, disapprove the decision in Huhn, and hold that the decision of whether to enforce the law by making an arrest is a basic judgmental or discretionary governmental function that is immune from suit, regardless of whether the decision is made by the officer on the street, by his sergeant, lieutenant or captain, or by the sheriff or chief of police.
The tragic circumstances of this case are as follows. A Pinellas County sheriff's deputy stopped the respondent, Willard, for a traffic violation. The deputy recognized, from his own observations and Willard's admission, that Willard had been drinking to some extent. The deputy did not, however, charge Willard with an intoxicated-driving offense. Rather, he issued Willard a traffic citation for making an improper U-turn and permitted him to drive on. Approximately fifteen minutes later, Willard was involved in a collision in which one person was killed and another was severely injured. The petitioners are the surviving crash victim and the father of the person killed. They filed suit against Willard, as well as the sheriff's deputy, the Pinellas County Sheriff's Department, and Pinellas County. The complaint alleged that the sheriff's deputy had negligently violated a duty to the petitioners by allowing Willard to drive subsequent to issuing him the traffic citation and that the violation of this duty resulted in the accident that caused petitioners' injuries.
The trial court dismissed the complaint for failure to state a cause of action against the deputy, the sheriff's office, and Pinellas County. In so doing, the court held that a law enforcement officer must have the discretion to enforce the law without being subject to tort liability for injuries to innocent third parties.
In affirming, the district court determined that the deputy's decision not to arrest Willard prior to the accident was operational in nature under the test of Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla. 1979), for which liability ordinarily would attach, but found that "merely because an activity is `operational,' it should not necessarily be removed from the `category of governmental activity which involves broad policy or planning decisions.'" 426 So.2d at 1001 (quoting Commercial Carrier, 371 So.2d at 1022). The court concluded that
the proper planning and implementation of a viable system of law enforcement for any governmental unit must necessarily *938 include the discretion of the officer on the scene to arrest or not arrest as his judgment at the time dictates. When that discretion is exercised, neither the officer nor the employing governmental entity should be held liable in tort for the consequences of the exercise of that discretion.
Id. at 1003-04.
In direct conflict with this holding is the Huhn decision of the Fifth District Court of Appeal, in which the court determined that a city could be held liable in tort for a police officer's failure to arrest and detain an intoxicated driver when that driver subsequently injures a third party. The Huhn court held that the arrest decision did not involve the exercise of a discretionary governmental function that is immune from tort liability and found the officer and the governmental entity that employed him liable for this conduct.
Our decision in Trianon Park Condominium Association v. City of Hialeah, 468 So.2d 912 (Fla. 1985), which explained that governmental entities are immune when making the basic decision of how to enforce the laws, controls the resolution of this cause. In Trianon we stated:
How a governmental entity, through its officials and employees, exercises its discretionary power to enforce compliance with the laws duly enacted by a governmental body is a matter of governance, for which there never has been a common law duty of care. This discretionary power to enforce compliance with the law, as well as the authority to protect the public safety, is most notably reflected in the discretionary power given to judges, prosecutors, arresting officers, and other law enforcement officials... .
Id., at 919.
It is important to recognize that, although the factual situations in this and the Huhn case concern the failure to arrest intoxicated drivers, the basic principle involved concerns the liability of all governmental bodies and their taxpayers for the negligent failure of their law enforcement officers to protect their citizens from every type of criminal offense. There has never been a common law duty of care owed to an individual with respect to the discretionary judgmental power granted a police officer to make an arrest and to enforce the law. This discretionary power is considered basic to the police power function of governmental entities and is recognized as critical to a law enforcement officer's ability to carry out his duties. See ABA Standards for Criminal Justice, Standard 1-4.1 (2d ed. 1980); President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 103-06 (1967). We recognize that, if a special relationship exists between an individual and a governmental entity, there could be a duty of care owed to the individual. This relationship is illustrated by the situation in which the police accept the responsibility to protect a particular person who has assisted them in the arrest or prosecution of criminal defendants and the individual is in danger due to that assistance. In such a case, a special duty to use reasonable care in the protection of the individual may arise. See, e.g., Schuster v. City of New York, 5 N.Y.2d 75, 154 N.E.2d 534, 180 N.Y.S.2d 265 (1958).
A law enforcement officer's duty to protect the citizens is a general duty owed to the public as a whole. The victim of a criminal offense, which might have been prevented through reasonable law enforcement action, does not establish a common law duty of care to the individual citizen and resulting tort liability, absent a special duty to the victim. This majority view was expressed by the United States Supreme Court in its early decision in South v. Maryland, 59 U.S. (18 How.) 396, 15 L.Ed. 433 (1855). A substantial majority of the jurisdictions in this country that have addressed this issue follow this view. See, e.g., Commercial Carrier; Trautman v. City of Stamford, 32 Conn. Supp. 258, 350 A.2d 782 (1975); Crouch v. Hall, 406 N.E.2d 303 (Ind. App. 1980); Commercial Union Insurance Co. v. City of Wichita, 217 Kan. 44, 536 P.2d 54 (1975); Zavala v. *939 Zinser, 123 Mich. App. 352, 333 N.W.2d 278 (1983); Cairl v. State, 323 N.W.2d 20 (Minn. 1982); Maynard v. City of Madison, 101 Wis.2d 273, 304 N.W.2d 163 (1981). We recognize that two jurisdictions have expressed a contrary view. See Ryan v. State, 134 Ariz. 308, 656 P.2d 597 (1982); Irwin v. Town of Ware, 392 Mass. 745, 467 N.E.2d 1292 (1984). In our opinion, there is no distinction between the immunity afforded the police officer in making a determination of whether to arrest an individual for an offense and the discretionary decision of the prosecutor of whether to prosecute an individual or the judge's decision of whether to release an individual on bail or to place him on probation. All of these decisions are basic discretionary, judgmental decisions that are inherent in enforcing the laws of the state. They are clearly not ministerial acts as contemplated by the Huhn decision or the dissents.
Our decision in this case is consistent with our holding in Wong v. City of Miami, 237 So.2d 132 (Fla. 1970), in which we held that a governmental entity could not be held liable for damage caused during a riot, regardless of the fact that the city had removed police officers dispatched to guard against the damage. In that case we stated that the determination of strategy and tactics for the deployment of police powers was inherent in the right to exercise those powers. Id. at 134. We concluded by noting that "sovereign authorities ought to be left free to exercise their discretion and choose the tactics deemed appropriate without worry over possible allegations of negligence." Id. We reaffirmed that principle in our decision in Commercial Carrier. 371 So.2d at 1019-20.
We note as we did in Trianon that this is a narrow issue relating to the discretionary judgmental decision of making an arrest under the police power of a governmental entity. It does not have the broad ramifications attributed to it by the dissents, nor does it recede from Commercial Carrier.
In conclusion, if a governmental entity is going to be held liable for the negligent discretionary, judgmental decisions made by its police officers in enforcing the law, this means of accountability by tort liability should be imposed by the elected representatives in the legislative branch who may create this new duty of care and place this fiscal responsibility on the governmental entity and its taxpayers, rather than having the judiciary establish this new duty by judicial fiat.
Accordingly, we approve the decision of the Second District Court of Appeal in the instant case and disapprove the Fifth District Court of Appeal decision in Huhn.
It is so ordered.
BOYD, C.J., and ALDERMAN and McDONALD, JJ., concur.
EHRLICH, J., dissents with an opinion.
SHAW, J., dissents with an opinion.
EHRLICH, Justice, dissenting.
I cannot agree that a police officer who, after stopping a dangerous driver and having "reason to believe that [the] person's ability to operate a motor vehicle is impaired by alcohol,"[1] releases the driver to continue an on-going violation of the law and so to massacre and mutilate innocent citizens of the state has performed the sort of policy-making function this Court immunized from tort liability in Commercial Carrier. This case does not merely deal with that indeed "discretionary exercise of police power authority" involved when a police officer decides whether or not to stop one particular motorist among the myriad drivers and in the face of developing situations. That is, in fact, an allocation-of-resources strategy decision similar to that discussed in Wong v. City of Miami, 237 So.2d 132 (Fla. 1970), cited with approval in Commercial Carrier. It cannot be fairly argued that the police officer who returned Marion Willard to the driver's seat of that vehicle was making a strategic decision about the deployment of *940 law enforcement resources. That decision was made when he stopped Willard and discovered his inebriation.
The majority misperceives the issue in this case by saying that it "concerns a law enforcement officer's discretionary police power authority to make or not make an arrest and whether a decision not to take an individual into custody constitutes a basic judgmental or decision-making function that is immune from tort liability." Willard was intoxicated, according to the allegations of the amended complaint. To arrest or not to arrest was not the decision facing the police officer. The legislature has long ago determined that an intoxicated driver is a menace to the safety of others and must be removed from the road. That policy decision has resulted in the enactment of legislation designed to achieve that end. How that policy decision is carried out is a ministerial act of the police officer. Arrest is one alternative. Another alternative is provided in section 396.072 which provides that intoxicated persons shall be taken into protective custody. A further alternative is section 856.011 which provides yet another means for getting a drunk off the highway. Letting the drunk stay on the road is not an alternative, and permitting him to continue driving violates the letter and the spirit of the statutes.
Yet the majority says that this is permissible and the governmental entity is immune from suit. However, if a private person violates a statute and such violation is the proximate cause of injury and damage to another, he is liable in damages for his tort. Section 768.28 says that if a private person be liable to the injured party in accordance with the general laws of the state, then the governmental entity is liable. It appears to me to be self evident that when the police officer failed to follow one of the statutory alternatives to keep the intoxicated driver from operating an automobile, and injury to another was proximately caused thereby, that the legislature fully intended to make the governmental entity liable for any acts of negligence committed by the police officer.
The tragic results of the officer's breach of duty were not merely foreseeable, they were highly predictable. It would be sheer sophistry to argue that the victims were not in the class the statute was designed to protect or that the harm was not precisely that which the statute was intended to prevent. The police officer was without the governmental authority to abet the violation of the law and to thus set into motion the events leading to this senseless tragedy.
I would embrace Judge Orfinger's thorough, compelling and just analysis in Huhn v. Dixie International Insurance Co., 453 So.2d 70 (Fla. 5th DCA 1984), as the proper standard for measuring the scope of sovereign immunity. There are no viable grounds for immunity here.
I would disapprove the decision of the district court.
SHAW, Justice, dissenting.
Before addressing the larger issue of sovereign immunity, it is necessary to address two errors of the district court.
Petitioner Trinko's complaint named Deputy Parker of the Pinellas County Sheriff's Department as a defendant in tort for actions allegedly committed within the scope of his employment. The district court held that Parker could not be named as a defendant because
Section 768.28(9)(a), Florida Statutes (1979), protects such an officer from being personally liable or from being named as a party defendant unless the officer acted in bad faith, with malicious intent, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. Appellant Trinko's complaint contains no such allegations regarding Deputy Parker and those counts of the complaint seeking damages from him should have been dismissed pursuant to section 768.28(9)(a).
Everton v. Willard, 426 So.2d 996, 998 (Fla. 2d DCA 1983). Section 768.28(9), *941 Florida Statutes (1979),[1] contains no subparagraph (a) and does not prohibit the naming of Parker as a defendant. Apparently, the intended reference was section 768.28(9)(a), Florida Statutes (Supp. 1980), which incorporated chapter 80-271, Laws of Florida. Section 1 of chapter 80-271 prohibited the naming of officers, employees, or agents of the state or its political subdivisions as defendants in tort suits. Section 4 of chapter 80-271 attempted to make the prohibition applicable to all actions then pending but we have held that this attempted retroactive application was unconstitutional. Rupp v. Bryant, 417 So.2d 658, 665-66 (Fla. 1982). Thus, petitioner Trinko was entitled under the 1979 statute to name Parker as a defendant. Two available theories of liability are discussed below: ministerial duty under section 316.193, Florida Statutes (1977), and the duty of those in charge of persons having dangerous propensities under Restatement (Second) of Torts, section 319 (1965).
The second preliminary error the district court committed was misapplication of the standard of appellate review of a motion to dismiss for failure to state a cause of action. In this posture appellate courts must assume for the purposes of review that all well-pleaded allegations of the complaint are true. From the statement of facts of the district court, it appears that the court reviewed the various answers and depositions and rendered what it perceived as a balanced statement of the "facts." The district court found that "Deputy Parker knew, by his own observations and by Willard's own admissions, that Willard had been drinking to some extent." Everton, 426 So.2d at 998. This innocuously mild statement severely understates the well-pleaded allegations that Willard was intoxicated, was making illegal U-turns across concrete median strips at dangerous intersections, was staggering when he exited his car  all in the presence of Deputy Parker  and that Parker admitted to the homicide investigating officer that he knew Willard was intoxicated when he released him. For a correct statement and application of the rule of law, see Huhn v. Dixie Insurance Co., 453 So.2d 70 (Fla. 5th DCA 1984), which the majority today disapproves. City of Daytona Beach v. Huhn, 468 So.2d 963 (Fla. 1985).
Based on the allegations and the rule of law the facts of the case are as follows. Willard was driving his vehicle while intoxicated on or about 22 June 1979 at approximately 2:35 a.m. Willard was speeding and running a red light when he collided with a second vehicle. The driver of the second vehicle was killed and various passengers injured. Approximately ten to twenty minutes prior to the homicide, Deputy Parker had observed Willard making an illegal U-turn at a dangerous intersection, against the red light and over a concrete median. After observing a second U-turn, Deputy Parker detained Willard and observed that he staggered when he exited his car, smelled of alcohol, and admitted that he had been drinking. A friend of Willard's arrived during the detention and offered to drive him home, but Deputy Parker successfully discouraged the offer. Instead, Deputy Parker issued a traffic citation for an illegal U-turn and released Willard to drive away in an intoxicated state. Deputy Parker knew, or should have known, that Willard was incapable of driving because of intoxication and posed a public hazard if permitted to drive. Deputy Parker admitted to the investigating officer at the homicide scene that he knew Willard was intoxicated when he earlier released him.
I turn now to the larger issue of sovereign immunity. Some general observations are appropriate. The series of decisions we issue today reflects the near total nullification of the legislative waiver of sovereign immunity.[2] After today a plaintiff suing a *942 government tortfeasor will have to overcome a formidable series of hurdles which effectively restore full sovereign immunity to the state and its political subdivisions. First, there is the four-part Evangelical Brethren[3] test which is ambiguous enough to produce whatever answer is desired. If the wrong answer is produced, i.e., that the government is not immune, then the plaintiff must pass the discretionary action test of Commercial Carrier[4] which has been so broadly interpreted as to include a dogcatcher knowingly releasing a vicious pit bulldog on the public as a discretionary activity.[5] In the extremely unlikely event the plaintiff's action survives these tests, the government by virtue of today's opinions is in a position to administer the coup de grace: there is no liability where the injurious action is performed under the police powers of the state. If that is not enough, the plaintiff will also discover that governmental functions are also immune, as are all functions not performed by private persons.
Florida Jurisprudence 2d Constitutional Law section 191 (1979) describes the definition, scope and extent of the police power thusly:
The police power of a state is very broad and comprehensive and is liberally understood and applied. While it is difficult and practically impossible to give an exact definition of the police power even if this were desirable, the impossibility of an exact definition does not render impossible such description of the power as may serve as a definition for current purposes. The police power of the state embraces its whole internal affairs and its civil and criminal polity. In a broad sense, all legislation and almost every function of civil government is included in the expression "police power." Police power has been defined as an exercise of the sovereign right of the state to enact laws for the protection of the lives, health, morals, comfort, and general welfare of the people.
The police power includes anything which is reasonable, necessary, and appropriate to secure the peace, order, protection, safety, good health, comfort, quiet, morals, welfare, prosperity, convenience, and best interest of the public. (Emphasis supplied, footnotes omitted.)
Given the sweep of discretionary activities and police power actions, I suggest that there is very little, if anything, left in the way of government action on which a tort victim could sue. In my view we have reached the point in our case law where we have only the most attenuated contact, if any, with the separation of powers doctrine on which Commercial Carrier rests and no contact at all with the statutory determination that government entities will be liable for their torts if a private person would under like circumstances be liable. Without comment, the majority opinion goes full circle and adopts the dissent to Commercial Carrier which maintained the view that the only government activities subject to suit were those which private individuals engaged in. This, of course, is simply a variation on the distinction between governmental and proprietary functions which we also rejected.
Our reading of section 768.28 has not merely thwarted the intent of the legislature to expand the right of tort victims to sue the state, it also takes away rights to sue in tort which existed prior to the waiver of sovereign immunity. Formerly, municipal governments, unlike the state and its political subdivisions, could be sued in tort. Hargrove v. Town of Cocoa Beach, 96 So.2d 130 (Fla. 1957). The statute, as we *943 have read it, now extends the sovereign immunity of the state to municipal governments. Formerly, tort victims could sue officers, employees, and agents of the state in their individual capacity. Rupp v. Bryant, 417 So.2d 658 (Fla. 1982). By our reading of section 768.28, this Court has extended the immunity of the state to those individuals. Thus, the immunity from suit now enjoyed by municipal governments and government employees is broader than that formerly enjoyed despite the legislative waiver of sovereign immunity. In both instances we have abrogated common law rights of action which existed prior to the adoption of the Constitution of 1968 and not provided an alternative remedy. Kluger v. White, 281 So.2d 1 (Fla. 1973).
I proceed now to a detailed analysis of the case and of the right of a tort victim to sue a government entity under the Florida Constitution and section 768.28, as amended.
In its opinion affirming the trial court, the district court recognized that Commercial Carrier established a "planning" versus "operational" test for determining whether the governmental entities possessed immunity for the challenged act; the former category being immune activity and the latter category being non-immune. The district court also found that the challenged act was unquestionably operational. Nevertheless, the court reasoned that the planning versus operational test was not dispositive because the discretion of a police officer to arrest or not arrest someone involved basic governmental policy, the exercise of which was essential to an effective law enforcement system. The court concluded that Commercial Carrier did not impose the "operational" test as an absolute restriction on immunity, that the challenged act met the four-pronged Evangelical test which Commercial Carrier commended for preliminary use despite the fact that it was operational, and, thus, the governmental entities were immune from tort liability. Based on this reasoning and conclusion, the court determined that
the proper planning and implementation of a viable system of law enforcement for any governmental unit must necessarily include the discretion of the officer on the scene to arrest or not arrest as his judgment at the time dictates. When that discretion is exercised, neither the officer nor the employing governmental entity should be held liable in tort for the consequences of the exercise of that discretion.
Everton, 426 So.2d at 1003-04.
In Commercial Carrier we addressed the scope of the waiver of sovereign immunity contained in section 768.28, Florida Statutes (1975). We recognized the broadness of the legislative waiver[6] and rejected various arguments designed to restrict its scope: (1) that the waiver covers only proprietary functions; (2) that the waiver applies only when the governmental entity owes a special duty to the plaintiff; and (3) that the waiver does not apply to governmental functions not performed by private individuals. We recognized also that the statute does not contain an exception for discretionary acts, unlike the Federal Tort *944 Claims Act[7] and acts from other states which expressly exempt discretionary activity from the waiver.[8] Nevertheless, we concluded that "certain policy-making, planning or judgmental governmental functions cannot be the subject of traditional tort liability." Commercial Carrier, 371 So.2d at 1020. The exception we judicially created was bottomed on the concept of the constitutional separation of powers because, we reasoned, "certain functions of coordinate branches of government may not be subjected to scrutiny by judge or jury as to the wisdom of their performance." Id. at 1022. We recognized that "the identification of these functions will in many instances be difficult" and the temptation "strong to fall back on semantic labels for ease of application and seeming certainty," but we declared we would eschew "this temptation, as it surely will result in a return to the overly structured and often misleading analysis which persists in the law of municipal sovereign immunity." Id. at 1020. In order to assist in identifying those immune functions, on a case-by-case basis, we adopted the analysis of Johnson v. State, 69 Cal.2d 782, 447 P.2d 352, 73 Cal. Rptr. 240 (1968), which was predicated on policy considerations and which adopted a test the court had previously articulated in Lipman v. Brisbane Elementary School District, 55 Cal.2d 224, 359 P.2d 465, 11 Cal. Rptr. 97 (1961). We also commended use of the preliminary four-question test set forth in Evangelical as a useful tool for analysis. The net result of the Johnson analysis and the preliminary test from Evangelical was to divide the universe of government torts into two categories: a "planning" category of basic policy decisions which would be immune from tort liability and an "operational" category of more routine, day-to-day, less critical decisions which would not enjoy absolute immunity. The formidable difficulties that we and the Johnson court anticipated in making these decisions on a case-by-case basis have eventuated as evidenced by the district court opinion here and opinions from other district courts. See supra note 9 at 17. As stated above, we recognized our difficulties would be accented if we fell into the trap of falling back on semantic labels for ease of application and seeming certainty; more specifically, the temptation to attempt to define "discretion" and to apply the definition to the challenged act to determine if the act involved an exercise of governmental discretion. The Johnson court anticipated and warned against this mind-set when it pointed out that
it would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit of some discretion in the manner of its performance, even if it involved only the driving of a nail.
Johnson, 447 P.2d at 357 (citations omitted).
The Johnson court recognized that to fall into this trap was to bring back sovereign immunity in another guise and to nullify the statutory waiver of sovereign immunity. The court went on to cite approvingly the applicability of the basic teaching that "when there is negligence, the rule is liability, immunity is the exception." Id. at 363 (quoting Muskopf v. Corning Hospital District, 55 Cal.2d 211, 219, 359 P.2d 457, 465, 11 Cal. Rptr. 89, 94 (1961)). Despite our avowed determination in Commercial Carrier not to fall into the semantic trap of attempting to define governmental discretion, *945 we have since done very little else when faced with sovereign immunity issues. Predictably, other than deciding on an ad hoc basis that a given plaintiff could or could not sue the state, our efforts have been futile. We have been unable to develop a coherent and principled rule of law based on the meaning of discretion or the application of the planning-operational dichotomy. See supra note 9 below.
The district court below expressed the view that the sovereign immunity problem "seems to become more tangled each time the courts attempt to untangle it" and that "[p]erhaps it is time, even past time, for the issue to be definitively and specifically addressed by the legislature so that the state, its agencies and subdivisions, can, with some degree of certainty, know the extent of their liability and guard against it." Everton, 426 So.2d at 999. The court also expressed its fears that we were drifting toward more and more cases requiring a jury determination of the questions of whether an allegedly tortious act was "operational" or "planning," "discretionary" or "nondiscretionary." The court saw a danger of increasingly larger jury verdicts and an intrusion of juries ill equipped to make informed decisions on functions of government peculiar to the act of governing. I understand the frustration and perplexity of the court in trying to deal with a complex area of the law using an analytical approach that requires an initial case-by-case determination of whether a trial court has jurisdiction to reach the merits of the complaint before it.[9]
The trial and district court judges have attempted to follow our guidance even *946 though it is recognized to be confusing. Our only defensible ground in Florida for creating a discretionary exception to the waiver of sovereign immunity is the constitutional doctrine of separation of powers. Where that constitutional doctrine is not violated, we have no authority to override the constitutional and statutory provisions authorizing access to the courts for bringing tort suits against the state. To paraphrase Justice Frankfurter in Indian Towing Co. v. United States, 350 U.S. 61, 67, 76 S.Ct. 122, 125, 100 L.Ed. 48 (1955), we are not the self-constituted guardians of the public purse empowered to import sovereign immunity into a statute designed to waive it. The legislature is the primary guardian of the public purse and we have no authority to override its determination that the government will be liable for its torts. It is clear to me that we need to revisit Commercial Carrier with a clean slate in order to return to the touchstones of our inquiry, the Florida Constitution, and the provisions of general law which implemented the constitutional provision for suing the state.
Article X, section 13, Florida Constitution, provides:
Provision may be made by general law for bringing suit against the state as to all liabilities now existing or hereafter originating.
Section 768.28(1), Florida Statutes (1983), provides in pertinent part:
Actions at law against the state or any of its agencies or subdivisions to recover damages in tort for money damages against the state or its agencies or subdivisions ... under circumstances in which the state or such agency or subdivision, if a private person, would be liable to the claimant, in accordance with the general laws of this state, may be prosecuted subject to the limitations specified in this act... .
Article V, section 1, Florida Constitution, provides:
The judicial power shall be vested in a supreme court, district courts of appeal, circuit courts and county courts. No other courts may be established by the state, any political subdivision or any municipality... .
Article I, section 21, Florida Constitution provides:
The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay.
Article II, section 3, Florida Constitution, provides:
The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein. (Emphasis added.)
Read together, the above constitutional and statutory provisions mandate that tort suits against the state be heard by the judicial branch. Article X, section 13 grants the legislature carte blanche to determine under what conditions the state may be sued. It has exercised its constitutional power by enacting section 768.28. The judicial power to hear suits is exclusive to the courts under article V, section 1. We have no constitutional power to refuse to hear suits for the redress of wrongs under article I, section 21. Even if it is assumed, arguendo, that the separation of powers doctrine somehow bars entertaining such suits in a court of law, article II, section 3 establishing the separation of powers by its terms contains an exception  "unless expressly provided herein"  which is met by the article X, section 13 provision for "suit against the state." A suit can only be heard in the judicial branch. The exception we carved out in Commercial Carrier can only be applicable to non-justiciable political questions which the courts are unable to answer: should a law be enacted, should a legislative bill be vetoed.
Applying the above to the case at hand, it is clear to me that the deputy sheriff's decision not to take charge of an intoxicated driver is not the basic governmental *947 policy decision which Commercial Carrier held to be immune under the separation of powers doctrine. The decision to release or not release a drunk driver is not a political decision. The issues presented by this case are justiciable in a court of law applying traditional tort principles.[10] Assuming as we must in the posture of the case, that Willard was intoxicated, the deputy sheriff was faced with the purely ministerial alternatives of taking custody of Willard by an arrest or, with appropriate instructions and safeguards, placing him in the custody of a responsible person, such as a friend, family member, or commercial taxicab driver who could provide safe transportation and prevent injury to others. The viable alternatives did not include leaving Willard behind the wheel of his vehicle where he posed an imminent threat to the public.
The decision as to whether a police officer may release an intoxicated driver to continue motoring on his way has been taken at the highest policy level. § 316.193, Fla. Stat. (1977). The legislature has decided that driving while intoxicated is a hazard to the public safety. Once an intoxicated driver is apprehended, the obvious intent of the legislature is first to immediately remove the intoxicated driver from the highway where he poses an imminent danger to the public safety and, second, to bring him into the legal system where any future threat he may pose to the public safety may be dealt with. It should be noted also that a private person in like circumstances would be liable under Restatement (Second) of Torts section 319 (1965):
Duty of Those in Charge of Person Having Dangerous Propensities  One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.
I emphasize that my view is not based on the general duty of police officers to attempt to apprehend intoxicated drivers. The police here actually apprehended an intoxicated driver. They thereby created a specific legal duty not to release a dangerous individual on to the public streets, which society and this Court should recognize. See the discussion of the Modlin doctrine[11] in my dissenting opinion to Trianon Park.
As noted above, unlike Florida law, the federal waiver of sovereign immunity contains an explicit exemption from suit for discretionary functions. Thus, federal law should logically be more receptive than Florida law to the argument that discretionary decisions of police officers are exempted from suit. It is noteworthy that the court in Downs v. United States, 522 F.2d 990 (6th Cir.1975), rejected this proposition under circumstances where an FBI agent in charge was faced with extremely difficult decisions as to how to cope with an aircraft hijacking. The court held that the agent's activities did not entail the formulation of governmental policy and did not fall within the discretionary function exception. Thus, in the court's view, it was proper to scrutinize the day-to-day activities of law enforcement officers for purposes of determining governmental tort liability. Similarly, although California statutorily excepts discretionary governmental activity, cases from that state have found there is no discretionary immunity under circumstances where a police officer apprehends a driver for traffic offenses. See Green v. City of Livermore, 117 Cal. App.3d 82, 172 *948 Cal. Rptr. 461 (1981) (no immunity following arrest of intoxicated driver for failure of an officer to remove keys from vehicle, which failure permitted intoxicated passenger to drive away, thereafter killing and injuring third parties); Duarte v. City of San Jose, 100 Cal. App.3d 648, 659, 161 Cal. Rptr. 140 (1980) (no immunity where police officer left intoxicated driver alone in police car and intoxicated driver stole police car, thereafter injuring third party); and Mann v. State, 70 Cal. App.3d 773, 139 Cal. Rptr. 82 (1977) (no immunity where police officer investigated stalled motorist on freeway and left motorist unattended to resume routine patrol duties).
A recent case from Massachusetts is extremely relevant. In Irwin v. Town of Ware, 392 Mass. 745, 467 N.E.2d 1292 (1984), the court faced the issue:
Is the decision of a police officer to remove from the roadways a driver who he knows or has reason to know is intoxicated a discretionary act within the meaning of G.L.C. 258, § 10(b).
Id. Factually, Town of Ware is directly on point. The police apprehended an intoxicated driver and released him to drive away. Subsequently, the intoxicated driver collided head-on with another vehicle. Fatalities and injuries occurred. Massachusetts law, like Florida law, provides in pertinent part that government entities will be liable for tortious acts of public employees acting within the scope of their employment "in the same manner and to the same extent as a private individual under like circumstances." Id. Unlike section 768.28, however, the Massachusetts legislation exempts discretionary functions or duties from the waiver of immunity, and Massachusetts courts are under a legislative mandate to bar suits on discretionary activities. Perceptively, the court first recognized that the question of whether immunity existed on the basis of discretion was a separate threshold question from whether there was negligence and that "immunity for discretionary functions did not extend to all requiring judgment because `the performance of all functions involves the exercise of discretion and judgment of some degree.'" Id. The court concluded in a passage which is directly on point here:
No reasonable basis exists for arguing that a police officer is making a policy or planning judgment in deciding whether to remove from the roadways a driver who he knows is intoxicated. Rather, the policy and planning decision to remove such drivers has already been made by the Legislature.
Id. 467 N.E.2d at 1299. The court then went on to discuss the question of duty under tort principles which was treated as independent of immunity. Without, of course, describing it as the Modlin doctrine, the court analyzed the public (general) duty  special duty principle. The court recognized that, arguably, the principle that violation of a public (general) duty does not create liability could be used to reintroduce general immunity under tort principles for government entities. The court avoided this result by applying the principle that a general duty does not preclude a special duty; the plaintiff must be permitted to show more  that there is a special duty. The court then concluded that Massachusetts statutes had established that there was a special duty or relationship between police who apprehended intoxicated drivers and potential plaintiffs who are harmed by release of the intoxicated driver.
The conflict between the approach taken by federal, California, and Massachusetts courts, on the one hand, and this Court, on the other, is striking. The former courts are statutorily mandated to recognize an exception for discretionary functions, yet they interpret discretion narrowly and obtain results which are legally defensible. By contrast, we have no mandate to exempt discretionary functions, yet we judicially create such an exemption and read it so broadly as to be indefensible on any discernible grounds.
Respondent and amici urge various reasons why immunity is necessary when a police officer is faced with a decision as to whether or not to arrest a particular individual. *949 Broadly, these reasons are based on the doctrine of the separation of powers. It is urged that judges and juries, in the later tranquility of the courtroom, cannot be permitted to "second guess" the decisions of police officers made under the stress and strain of the "street world" with its conflicting demands and dangers. I appreciate the difficulties faced by police officers, but the very demands and dangers faced by these officers and the speed with which they must act is itself an argument for examining these actions in the later tranquility of a court. The purpose of the examination is to do justice to the purported tort victim and to bring problems to the attention of the government and public; it is not to discipline, punish or even criticize the police officers' conduct.[12] It is inevitable under the circumstances of police work, indeed of any work, that tortious errors will be made. These errors will no necessarily result from bad faith, malice, or wanton and willful conduct by the police officer. Except for those instances where the police officer is alleged to have so acted, the officer is statutorily exempted from any liability or even from suit under section 768.28(9)(a), as amended in 1980. This is constitutionally permissible so long as the alternative remedy of suing the government is available. Further, judges and juries routinely examine or "second guess" the actions of police officers in order to protect the constitutional rights of accused persons without any suggestion or fear that this violates the separation of powers doctrine. I can see no reason why courts should not hear justiciable tort suits in order to protect the constitutional right of tort victims to access to the courts for redress of wrongs by governmental entities and their employees. Indeed, in my view, we have the constitutional duty to do so.
Respondents and amici urge that denying immunity for the discretionary acts of police officers will "chill" the officers in the performance of their duties. I do not believe there will be any unwholesome chilling of police officer conduct. My view is consistent with the Downs court's rejection of the "chilling effect" argument:
The prospect of governmental liability for the actions of law enforcement officers should not cause those officers less vigorously to enforce the law. The need for compensation to citizens injured by the torts of government employees outweighs whatever slight effect vicarious government liability might have on law enforcement efforts.
Downs v. United States, 522 F.2d at 998. As noted above, barring misconduct, there is no individual liability for such torts. The legislature has withdrawn the right for a cause of action against the public employee, except as specified, but allows redress for the tort by granting a cause of action against the governmental entity. It is the governmental entity which is being denied immunity. The choice is whether the tort victim should bear the full cost of the injuries or whether society at large, through its government, should bear the cost of torts committed in the scope of governmental activities. The choice has already been made by the legislature in accordance with article X, section 13, Florida Constitution, and we have no authority to overrule that decision.[13]
*950 It is our task to read section 768.28, as subsequently amended, along with other relevant statutes, in pari materia so as to effect the legislative intent. It is also our responsibility to respect the doctrine of the separation of powers and not intrude into decision-making areas which are constitutionally reserved to the coordinate branches. In candor, we should recognize that the operational/planning dichotomy bottomed on separation of powers which Commercial Carrier established has proven to be exceedingly difficult to apply and that the Commercial Carrier approach, as it has evolved, has lost contact with its constitutional bottom. We should regain contact by emphasizing:
1. In view of article I, section 21; article X, section 13; and section 768.28, there is a strong presumption that courts have jurisdiction to hear tort suits against governmental entities. The burden is on the governmental entities to overcome that presumption by showing that hearing the suit would violate the separation of powers doctrine. Whatever aids, analytical approaches, or arguments are used, the focus of the inquiry must be the doctrine of separation of powers. In Florida there is no basis for immunity unless that doctrine is violated.
2. The adequacy of the complaint should be tested by application of the standard tort definitions used in suits against private persons: duty, duty violated, and injury as proximate result. The first prong, duty, deserves additional comment as it is particularly critical in the evolution of governmental tort law. The Modlin doctrine properly applied is the correct test. There must be an allegation of a special relationship or duty between the government entity and either the alleged tortfeasor or victim. A general duty, without more, does not establish a special relationship or duty. Conversely, the presence of a general duty does not preclude a showing of a special relationship or duty. Modlin v. City of Miami Beach, 201 So.2d 70 (Fla. 1967). Two examples will illustrate the point, one based on this case and one drawn from Department of Transportation v. Neilson, 419 So.2d 1071 (Fla. 1982). First, given the finiteness of government resources, governments have not undertaken, nor can they reasonably be expected, to provide protection for all citizens at all times from illegal or tortious activities of other citizens. The fact that an intoxicated driver or other law violator or tortfeasor injures someone does not, without more, create government liability. There must be a showing, or allegation as here, under traditional tort law that the government entity owed a duty to the plaintiff and that duty was violated. Second, as we said in Neilson, "[t]he fact that a road is built with a sharp curve is not in itself a design defect which creates governmental liability." Id. at 1078. There is no duty to build unbending roads which can be traveled at high speeds, but there is a duty to warn if a curve cannot be safely negotiated at the legal or posted speed. There is no duty to replace existing traffic control devices with more sophisticated, state-of-the-art devices, but there is a duty to properly maintain existing traffic control devices. There is no duty to build a new road or to change an existing road but there is a duty to warn of, correct, or not create known dangerous conditions. See our discussion in Neilson, 419 So.2d at 1077-78 which, if closely read, rests comfortably on traditional tort principles.[14]
*951 The district court raised the specter of increasingly larger jury verdicts which would pose a critical danger to the financial well being, even the continued existence, of some governmental entities. Although the role of the courts is not central in resolving such financial questions, we are nevertheless peripherally concerned and must take care to ensure that, as Justice Frankfurter put it in Indian River Towing, 350 U.S. at 67, 76 S.Ct. at 126, "this Court must not promote profligacy by careless construction." Accordingly, I have undertaken a full review of the statutory provisions which prescribe measures for coping with the financial burdens that the waiver of sovereign immunity necessarily entails. As will be seen, the legislature has done its work well in devising a coherent systematic plan for dealing with these financial burdens while still providing for adequate compensation for governmental tort victims.
For purposes of tort liability, section 768.28 treats government entities as if they were private persons: the plaintiff bears the burden of proving actionable negligence under the general tort law of the state but the tortfeasor, not the tort victim, will bear the burden of liability if tortious conduct is proven. The key to understanding the legislative approach to dealing with these potential financial burdens is its central theme: governmental entities should protect themselves as if they were a prudent private person managing a large enterprise with a great deal of exposure to potential tort liability.[15] Broadly, the legislature adopted three measures. The first measure flows from the waiver of sovereign immunity. The fact that government at all levels is no longer immune from the torts committed by itself or its employees in the scope of their duties has the salutary effect of focusing attention on the sound public policy of preventing governmental torts. Chapter 284, Florida Statutes (1983), requires risk management and safety programs at the state level and provides a model for political subdivisions.
*952 The second measure adopted by the legislature, and by far the most important, is the provisions for liability insurance. See supra notes 13 at 26 and 15 at 29. Section 768.28(13), as amended through 1983, authorizes all government entities to be self-insured, to enter into risk management programs, to purchase liability insurance for whatever coverage they may choose, or to have any combination of the preceding. Section 768.28(10) provides that laws allowing government entities to buy insurance are unimpaired by section 768.28. Section 286.28, Florida Statutes (1983) (formerly section 455.06), is the most significant of these laws authorizing the purchase of insurance by political subdivisions. By its terms, subsection 286.28(2) states that liability insurance contracts shall provide that the "insurer shall not be entitled to the benefit of the defense of governmental immunity ... in any suit instituted against any such political subdivision ... and that the immunity of said political subdivision against any liability described in subsection (1) ... are waived to the extent of such insured coverage." When originally enacted in 1953 by chapter 28220, Laws of Florida (1953), section 286.28 applied only to liability insurance on motor vehicles and excluded from its operations incorporated cities and towns, which it regarded as public or quasi-public corporations. Since 1953, amendments to the statute have greatly expanded its applicability and it now encompasses all governmental entities which "perform operations in the state or elsewhere." The original exclusion of incorporated cities or towns was based on the distinction in tort law in 1953 between municipalities and political subdivisions of the state. That distinction disappeared with the enactment of section 768.28 in 1973. Municipalities are now included within the definition of state agencies or political subdivisions in section 768.28(2). See Commercial Carrier, 371 So.2d at 1016. We recently addressed the impact of section 768.28 on section 286.28 and held that section 768.28 incorporated section 286.28 into "the overall scheme of the legislature relating to the waiver of sovereign immunity." Ingraham v. Dade County School Board, 450 So.2d 847 (Fla. 1984).[16]
The intentions of the legislature are clear: governmental entities are authorized to obtain liability insurance coverage in any amount; liability insurance contracts purchased by governmental entities shall prohibit the defense of sovereign immunity to the extent of the coverage; where liability insurance exists neither the governmental entity nor the insurer may claim sovereign immunity up to the limits of the contract; statutory caps on governmental liability are waived to the limits of insurance policy coverage. (Statutory caps are discussed more fully below.) The central thrust of the legislative scheme is apparent. The legislature has acted to encourage the purchase of liability insurance, or self-insurance, by governmental entities and to ensure that the governmental entities and their tort victims receive the full benefit of the premiums paid and the coverage obtained on such insurance contracts. The legislature has stopped short of directing *953 that such insurance be purchased, presumably on the basis that the executive branch and political subdivisions can better determine the specific coverage which they require. To aid the governmental entities in managing their insurance and liability responsibilities, sections 768.28(6), (7), and (11) establish requirements that claims be presented to the entity involved, plus the Department of Insurance in the case of state agencies, prior to suit, and that such claims and suits be filed within a statute of limitations. At the state level, chapter 284 governs risk management and oversight by the Department of Insurance. Local governments through voluntary associations obtain similar advantages, e.g., self-insurance, management assistance, group insurance, excess coverage.
The final measure the legislature has adopted deals with safeguarding government entities from large, perhaps lethal, damage judgments. Governmental entities and their financial resources vary widely from the populous counties or metropolitan areas to the small municipalities. The legislature has devised a system which accommodates itself to these differences, and yet provides a method for adequately compensating tort victims. As a fail-safe device, section 768.28(5) places a cap on the compensatory damages which a governmental entity may be required to pay and prohibits punitive damages or interest for the period before judgment.[17] This cap, however, is not absolute. It is qualified by: first, the provisions discussed above which raise the cap to the actual coverage provided by liability insurance; and, second, the provision in section 768.28(5) that judgments in excess of the statutory cap may be reported to the legislature, which, in its discretion, may direct that the excess judgment be paid in whole or part. There are two complementary reasons why a governmental entity would or should obtain coverage which compensates a tort victim in excess of the statutory cap. The first is that the entity may feel a moral obligation to fully compensate tort victims, thus maintaining its self and public respect by demonstrating its sense of responsibility to its citizens. The second is that the legislature may direct that a tort victim be compensated above the statutory cap and, consequently, the governmental entity may well end up with a legal, as well as a moral, responsibility to compensate the tort victim. The latter is not an unlikely possibility. In the four years, 1981-84, the legislature enacted twenty-six special relief acts authorizing and directing political subdivisions and state agencies to pay a total of $9,427,181.30 to government tort victims.[18] This additional compensation was in addition to the statutory or insurance policy limits of section 768.28. The amount of individual relief ranged from just under four thousand dollars to just under four million dollars. The average additional compensation was $362,583.90. The number and amount of the relief bills strongly suggests that the legislature continues to be in deadly earnest about carrying out the intent of article X, section 13 and section 768.28 that government tortfeasors will compensate their tort victims regardless of whether the government entity wishes to or not. See Hess v. Metro Dade County, 467 So.2d 297 (Fla. 1985), where we upheld the constitutional authority of the legislature to direct the payment of compensation to government tort victims.[19]
*954 As can be seen from the above analysis, the district courts' fears that the waiver of sovereign immunity will lead to financial insolvency of government entities is not well founded. Or, to put it another way, the legislature has obviously anticipated this problem and has put in place measures which the legislature believes will deal with it. We have no reason to doubt the adequacy of these measures, but even if we did, it is not our role to overrule the legislature because we consider legislation to be unwise. If these measures prove to be inadequate, the legislature is positioned to quickly institute additional corrective measures, including, if necessary, a complete recession of the waiver of sovereign immunity. As indicated above, the role of the courts is relatively limited. We need only to carry out the legislative intent by following the plain meaning of these statutory provisions. Tort suits against the state will be heard by applying the general tort law of the state.
Some twenty-eight years ago Justice Thornal, writing for this Court, recorded, in unmistakable terms, our disapproval, even abhorrence, of the doctrine of sovereign immunity.
Immunization in the exercise of governmental functions has been traditionally put on the theory that "the king can do no wrong but his ministers may". In applying this theory the courts have transposed into our democratic system the concept that the sovereign is divine and that divinity is beyond reproach. In preserving the theory they seem to have overlooked completely the wrongs that produced our Declaration of Independence and in the ultimate resulted in the Revolutionary War. We, therefore, feel that the time has arrived to declare this doctrine anachronistic not only to our system of justice but to our traditional concepts of democratic government.
The immunity theory has been further supported with the idea that it is better for an individual to suffer a grievous wrong than to impose liability on the people vicariously through their government. If there is anything more than a sham to our constitutional guarantee that the courts shall always be open to redress wrongs and to our sense of justice that there shall be a remedy for every wrong committed, then certainly this basis for the rule cannot be supported. *955 Hargrove v. Town of Cocoa Beach, 96 So.2d 130 (Fla. 1957). The people, the legislature, and the executive branch apparently agree with this observation. They have implemented the constitutional provision for suits against the state by enacting a broad waiver of sovereign immunity into general law and tasking the judiciary with the responsibility for hearing tort suits against the state, its agencies, and political subdivisions. We should not resurrect sovereign immunity under the label of the separation of powers or police powers doctrine.
NOTES
[1] § 316.1932(1)(b)(1), Fla. Stat. (1983).
[1] The reference should have been to Florida Statutes (1977) because the incident at issue occurred on 22 June 1979. However, this aspect of the error is inconsequential in that section 768.28(9) was unchanged from 1977 to 1979.
[2] Duvall v. City of Cape Coral, 468 So.2d 961 (Fla. 1985); Trianon Park Condominium Ass'n v. City of Hialeah, 468 So.2d 912 (Fla. 1985); Rodriguez v. City of Cape Coral, 468 So.2d 963 (Fla. 1985); City of Daytona Beach v. Palmer, 469 So.2d 121 (Fla. 1985); City of Daytona Beach v. Huhn, 468 So.2d 963 (Fla. 1985); and Carter v. City of Stuart, 468 So.2d 955 (Fla. 1985); Reddish v. Smith, 468 So.2d 929 (Fla. 1985).
[3] Evangelical United Brethren Church v. State, 67 Wash.2d 246, 407 P.2d 440 (1965).
[4] Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla. 1979).
[5] Carter v. City of Stuart, 468 So.2d 955 (Fla. 1985).
[6] There are only three statutory exceptions to the waiver of sovereign immunity. First, where the responsible officer, employee, or agent was maliciously motivated and the tort was intentional. § 768.28(9). This is consistent with the limitation that punitive damages may not be awarded against the state. The liability falls entirely on the individual tortfeasor. Second, where the officer, employee, or agent was acting outside the scope of employment. § 768.28(9). This is consistent with the general law of the state that the principal is not vicariously liable when the agent is on a lark of his own. Third, no action may be brought when the "victim" is unlawfully participating in a riot, unlawful assembly, public demonstration, mob violence, or civil disobedience. § 768.28(12). This is consistent with the equitable notion that the state will not compensate the wrongdoer for the consequences of his wrongs. So far as I am aware, none of these exceptions has been raised in our case law and, significantly, we have never relied on provisions of the statute itself to hold that the state was immune in a given suit. Commercial Carrier and its progeny deal only with judicially created exceptions to the legislative waiver of immunity.
[7] The Federal Tort Claims Act is contained within Title 28, U.S. Code sections 1346(b) and 2671-2680.
[8] We could have strengthened our conclusion that the legislature did not intend a discretionary exception to the waiver by noting that section 768.15, Florida Statutes (1969), enacted by chapter 69-116, which waived sovereign immunity but contained a discretionary exception was repealed in the same legislative session by chapter 69-357, section 1, Laws of Florida. The discretionary exception was not included when the legislature reenacted the waiver of sovereign immunity, section 768.28, in 1973. This change in the law reflects a conscious decision on the part of the legislature to broadly waive sovereign immunity without a discretionary exception. Davis v. Florida Power Co., 64 Fla. 246, 60 So. 759 (1913).
[9] Other district courts have made similar comments. In Bryan v. State, 438 So.2d 415 (Fla. 1st DCA 1983), the court commented that the Evangelical test "has not proved to be of significant help in a number of cases in which the courts have been called upon to determine whether a Commercial Carrier sovereign immunity exception should be found," [citations omitted] and "[f]rankly ... we find the attempted application of the above four-prong test ill-suited as an aid in resolving the sovereign immunity issue in the instant case." Id. at 420.

In Broward County v. Payne, 437 So.2d 719 (Fla. 4th DCA 1983), the court commented on its uncertainty as to the delineation between operations and planning in certifying three questions of great public importance to the Supreme Court. The court then added:
We also take judicial notice of the fact that the recent lower court decisions, law review notes and legal periodical articles redound with wailing and gnashing of teeth on how to define and apply the dictates of Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla. 1979). The so-called Modlin doctrine discarded by Commercial Carrier may well have been unsatisfactory but at least we all understood it!
Id. at 721.
In Carter v. City of Stuart, 433 So.2d 669 (Fla. 4th DCA 1983), the court certified a question of great importance to the Supreme Court with the comment that Florida case law was in disarray on the overall question of what constitutes "planning" and "operational" activities and
the only way out of the impasse at the District Court level is to certify each and every case to the Supreme Court, on its particular facts, and let our superiors show us the way until the law is clarified or Commercial Carrier is receded from.
Id. at 670.
In Neumann v. Davis Water and Waste, Inc. 433 So.2d 559 (Fla. 2d DCA 1983), the court commented that it found the Evangelical test uninstructive, that litigants were perplexed by the new set of labels from Commercial Carrier (discretionary versus nondiscretionary, operational versus planning), and that the instant case presented another square peg which would not fit the labels. The court then declined to assign a label to the challenged government activity and simply held that it was immune.
In Collom v. City of St. Petersburg, 400 So.2d 507 (Fla. 2d DCA 1981), approved 419 So.2d 1082 (Fla. 1982), the court commented that under section 768.28, Florida Statutes (1973), and Commercial Carrier everything had changed yet nothing had changed and that the operational/planning dichotomy may be a classic example of adding further confusion through an attempt to clarify tenuous concepts with labels.
In a dissent to Department of Transp. v. Neilson, 419 So.2d 1071, 1079 (Fla. 1982), the writer of Commercial Carrier, Justice Sundberg, commented:
In a laudable effort to simplify the distinction between those acts of governmental agencies which still enjoy immunity and those which do not, it occurs to me that the majority has simply exchanged one set of result descriptive labels for another. Hence, the irreconcilable results among the several district courts of appeal are not harmonized, but rather the confusion is compounded. The enigma is now shrouded in mystery. Because I believe it need not be so, I respectfully dissent.
[10] See generally, Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) on justiciability. Moreover, as Justice Holmes pointed out in Nixon v. Herndon, 273 U.S. 536, 536, 47 S.Ct. 446, 446, 71 L.Ed. 759 (1927), where there is "private damage" even "political" actions may be adjudicated under both English and American law:

That private damage may be caused by such political action and may be recovered for in a suit at law hardly has been doubted for over two hundred years, since Ashby v. White, 2 Ld.Raym. 938, 3 Ld.Raym. 320, and has been recognized by this Court. (Citations omitted.)
[11] Modlin v. City of Miami Beach, 201 So.2d 70 (Fla. 1967).
[12] Respondent and amici misunderstand the nature of employee discipline. If a public employee exercises bad judgment or is negligent in the scope of employment, it is no defense to argue that he should not be disciplined because the unsatisfactory performance is excused by sovereign immunity. I assume with confidence that supervisory authorities are sufficiently responsible to discipline or correct employee negligence regardless of whether the government entity is immune or nonliable. Conversely, if respondent and amici are arguing that courts should assist in concealing torts, the argument is unworthy of comment.
[13] Any doubt about the legislative intent in enacting the waiver of sovereign immunity can be resolved by listening to the tapes of the hearings before the House Judiciary Committee in 1973. These hearings culminated on April 12, 1973. At this hearing lobbyists representing county commissions and school boards appeared and urged that the waiver not be enacted because of the potential liability it would create and the difficulties it would pose for governmental entities. Representatives Tucker and Martinez, the sponsors of House Bill 315 waiving sovereign immunity, replied in unmistakable terms that: (1) governmental entities were not kings who could do no wrong; (2) the purpose of the bill was to compensate victims of governmental torts just as victims of private tortfeasors were compensated; (3) governmental entities should have insurance to compensate victims; (4) the cost of insurance and of compensating victims was a legitimate cost of government which the people should support; and (5) it was inconceivable, in the sponsors' view, that anyone in contemporary times could oppose the right of a tort victim to seek redress in a court of law. The committee then voted 14 to report the bill. See Tape 1, Hearings before House Judiciary Committee, 4-12-73, series 414, Florida State Archives.
[14] Based on the facts given in the opinions, other cases which should have been grounded on traditional tort principles include Trianon Park; Perez v. Department of Transp., 435 So.2d 830 (Fla. 1983); Harrison v. Escambia County School Bd., 434 So.2d 316 (Fla. 1983); Ingham v. State Dep't of Transp., 419 So.2d 1081 (Fla. 1982); and City of St. Petersburg v. Collom, 419 So.2d 1082 (1982). These cases illustrate the point that the waiver of sovereign immunity does not in itself create liability. As with private parties in like circumstances, the plaintiff must still show that the defendant owed a duty to him, that the duty was violated, and that injury occurred as a result. The notion that sovereign immunity is the only device to prevent massive raids on the public purse by undeserving plaintiffs is based on the unspoken premise that traditional tort law is inadequate to protect governmental defendants from undeserving plaintiffs. Aside from the question of its truth, this premise must be rejected because it is contrary to the legislative determination that governmental entities will be treated as private persons would in like circumstances.
[15] The enterprise theory simply spreads the cost of torts over the consumers of the products of the enterprise. It is not only found in tort law but can be found in workers' compensation and social security. Both Representatives Tucker and Martinez, sponsors, expounded the enterprise theory in supporting the legislative waiver of sovereign immunity, section 768.28. Representative Tucker's words are particularly cogent:

We are trying to protect everybody. If everyone shares in the cost of that protection [government], then everyone benefits... . This whole concept that we are seeking now, not the individual bill, but the whole concept of waiving sovereign immunity, we are trying to provide for rights. If you are a conservative person, then you believe in conserving human life, you believe in protecting people against the willful or negligent acts of others and we have a responsibility to the people of this state. The only excuse for government is to help the people, and if we are not going to help the people, we shouldn't have government. It costs to operate government and the people share in that cost. So, they are doing it for their own benefit.
... .
I pay my taxes here to support the schools, and I don't mind paying a little bit more to see that my children are protected and that my friends are protected, and that I am protected if I am using the property. I don't mind and I don't think you should either. I think it is ridiculous for any person  the law is so strong in this area that we are going to require this session that everyone have insurance, and be against the law to drive without insurance. It ought to be against the law for you[*] to operate without insurance to protect the people of this state.
See supra note 13 at 26.
[*] Addressed to government lobbyists appearing before the committee to oppose the waiver of sovereign immunity which treated governments as private persons.
[16] The importance of section 286.28 (formerly 455.06) has been generally overlooked. By 1963 section 455.06(1) had been amended to permit purchase by political subdivisions of liability insurance for the operation of motor vehicles, watercraft and aircraft, for buildings or properties, and for operations in the state or elsewhere. The purchase of such policies, however, was contingent on a waiver of sovereign immunity. § 455.06(2). This contingently broad waiver was further expanded by chapter 71-230, Laws of Florida, which permitted the purchase of liability insurance protecting not only the political subdivisions but "their agents and employees while acting within the scope of their employment." Id. It should be noted that these provisions of law contingently waiving sovereign immunity on a broad basis were in effect some four years before the noncontingent waiver of sovereign immunity in section 768.28. The contingent waiver remains in effect. Ingraham. The conclusion is inescapable: when the state or a political subdivision has purchased liability insurance which covers the tort injury sued on, neither the government unit nor the insurance company may plead sovereign immunity. To do so would utterly frustrate legislative intent and render the payment of insurance premiums a useless act. The point of law has not been argued before us or, so far as it can be told, in the courts below.
[17] By contrast, the Federal Tort Claims Act places no limit on compensatory damages.
[18] Ch. 81-330, 331, 332, 336, 359, 455; ch. 82-308, 366, 371; ch. 83-395, 393, 394, 426, 428, 430, 488; ch. 84-383, 385, 395, 418, 419, 424, 454, 459, 494, 528.
[19] These relief acts illustrate other aspects of the waiver of sovereign immunity. Provided that the courts respect the immunity waiver and hear the suit, it enables the legislature to consider only those government torts where a legal judgment has been rendered and the injuries exceed the statutory cap. In 1973, the last full year prior to waiver, the legislature enacted fifteen relief bills to compensate tort victims whose cause of action against the government was barred by sovereign immunity. The legislature is, of course, ill-equipped to make the factual and legal findings as to whether liability is present in a specific case, and, if so, the extent of the injury. Section 768.28 relieves the legislature of this burden by presenting it with a court judgment on which it can base its determination of whether to exceed the statutory cap on damages. At the same time, it places the legislature in a position to oversee tort awards, to prevent extravagant or even collusive awards to undeserving plaintiffs, and to amend the law as experience dictates. This case and the companion case issued this date, Duvall v. City of Cape Coral, No. 63,441 (Fla. Apr. 4, 1985), also illustrate two other troubling aspect of reading the separation of powers doctrine broadly so as to immunize discretionary or planning activities. Prior to the legislative waiver of sovereign immunity the tort victim had no judicial cause of action against governmental entities but could go directly to the legislature seeking a special relief bill. Following the waiver of sovereign immunity the tort victim is expected to seek a judicial remedy, the denial of which on sovereign immunity grounds may take years without presenting the legislature with a judgment that there was or was not negligence. Second, this Court has created two unequal classes of government tort victims in violation of the United States and Florida Constitutions. In the first class, where we acknowledge the authority of the legislature to waive sovereign immunity, the victims are granted access to the courts and compensated for their injuries. In the second class, where we deny the authority of the legislature to waive sovereign immunity, the victims are denied access to the courts and receive no compensation for their injuries in a court of law. It is not clear whether the majority would go so far as to deny the legislature the authority to pass special relief acts compensating this second class of tort victims. Logically, however, if the majority is correct in its position that the separation of powers bars courts from hearing such suits because of the chilling effect on the executive branch, then the legislature is also barred from chilling executive branch actions by "second guessing" and finding negligence. Thus, we have the reductio ad absurdum that no one or no power can constitutionally oversee the tortious activities of the executive branch: not the people through article I, section 21 (access to courts for redress of wrongs) and article X, section 13 (provision may be made by general law for bringing suit against the state), not the legislature through article III, section I (legislative power) and section 768.28 (waiver of sovereign immunity), and not the courts through article V, section 1 (judicial power to hear suits).