586 So.2d 1180 (1991)
STATE of Florida, OFFICE OF the STATE ATTORNEY FOR the THIRTEENTH JUDICIAL CIRCUIT, Appellant,
v.
Ruby Whylly POWELL, Appellee.
No. 90-02517.
District Court of Appeal of Florida, Second District.
September 11, 1991.
Rehearing Denied October 15, 1991.
*1181 Robert A. Butterworth, Atty. Gen., Tallahassee, and Louis F. Hubener, Asst. Atty. Gen., Tampa, for appellant.
Joel D. Eaton of Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., Miami, Brown, Terrell, Hogan & Ellis, P.A., Jacksonville, and Wagner, Cunningham, Vaughan & McLaughlin, P.A., Tampa, for appellee.
Barbara Green and Dawn Euringer of Freidin, Hirsh & Green, Miami, and Karen J. Hass, Miami, amicus curiae/The Academy of Florida Trial Lawyers and Florida Ass'n for Women Lawyers, Dade County Chapter.
PARKER, Judge.
The State of Florida, Office of the State Attorney for the Thirteenth Judicial Circuit, appeals a final judgment entered against the state attorney and in favor of Ruby Whylly Powell. Powell filed a negligence claim against the state attorney, based upon the fact that she was set on fire by her husband when she appeared in court in response to a state attorney subpoena. The jury assessed damages of $2,300,000 and found Powell fifty percent negligent. We reverse, concluding that the office of the state attorney owed Powell no statutory duty of care and that no special relationship existed to create a common law duty of care.
Ms. Powell was married to Jerome Whylly. In 1981, she returned to their apartment after work and discovered bite marks and cigarette burns on their baby. Whylly, who was on probation for aggravated assault, threatened Ms. Powell with a knife and told her not to take the baby to the hospital. She slipped away with her two children, telephoned the sheriff's office, and took the baby to an emergency room. Ms. Powell then moved into a cousin's home.
*1182 When Ms. Powell returned to the apartment for clothes, she found a note and letter from Whylly in which he threatened her. She took the note and letter to an assistant state attorney who told her that nothing could be done. A few days later, she returned to the apartment and found more threatening letters from Whylly. After presenting these to the sheriff's office, they directed Ms. Powell to the state attorney's office. At that time, the state attorney's office initiated an investigation to determine whether charges should be filed against Whylly. In the same month, the state attorney's office received the report concerning the child, determined that Whylly was on probation, and obtained an arrest warrant for Whylly for violation of probation. Whylly was arrested on the probation violation charge. Subsequently, he was released on his own recognizance.
One month later, the state attorney's office served Ms. Powell with a subpoena to appear at Whylly's violation of probation hearing. She arrived at the courthouse to attend the hearing and found her husband waiting in the courtroom. Whylly threatened to hurt Ms. Powell if she stayed in the courtroom. She became frightened and returned home. When telephoned by Rick Schultz, an assistant state attorney, Ms. Powell explained that she had not attended court because she did not receive a subpoena. A few days later, Ms. Powell called Schultz to say that she had lied about not receiving the subpoena and that she had gone to court but her husband would not let her in the courtroom. Ms. Powell stated Schultz's only response was that his office would reschedule the hearing. Schultz testified he had no recollection of this conversation. The state attorney's office again subpoenaed Ms. Powell to appear at the violation of probation hearing, which was rescheduled for July 9, 1981.
On July 4, at Whylly's request, Ms. Powell took both children to visit Whylly. During this visit, she told Whylly she intended to testify at the hearing scheduled for July 9, 1981.
In the early morning of July 9, 1981, Whylly telephoned Ms. Powell and told her that he would hurt her if she appeared at court that day to testify. Ms. Powell called the police department and the sheriff's office; both refused her request for an escort. Ms. Powell testified:
After that I called the State Attorney's Office. I called and talked to Mr. Schultz, and the lady told me he was in a meeting. So I told her that I was Ruby Whylly, and I needed to talk to him because it was important because my husband called me and threatened me. And she told me, well, I'm sorry, he still can't talk to you. And I said I got to come to court and I'm scared. She said do you have a subpoena? And I said, yes, Ma'am. And she said if you have a subpoena, you better come on to court.
Armed with a pistol and a can of mace, Ms. Powell left for court with a neighbor. Upon arriving at the courthouse, she went directly to the courtroom and found Whylly sitting on a bench outside the courtroom. Ms. Powell testified that Whylly pulled her outside the building by tugging at her pants. A witness, sitting nearby, testified that Ms. Powell and Whylly were talking before they went outside, but not loudly. The witness stated that Whylly did not appear to use any force to get Ms. Powell outside, although Whylly used a finger to grab for her pocket. When Ms. Powell left the courthouse with Whylly, an armed security guard was standing close-by in the hallway. Both the witness and the security guard testified that uniformed deputies, officers, and bailiffs were in the area.[1]
Once outside, Ms. Powell and Whylly spoke for a moment, and Whylly tried to persuade Ms. Powell to go home. Ms. Powell refused, and as she turned to reenter the courthouse, Whylly poured gasoline onto her and set her ablaze. She was severely burned. As a result, she was unable to work for thirteen months and has *1183 scars on her face, arms, chest, stomach, and right thigh.
Ms. Powell's action against the state attorney proceeded to a jury trial. At the close of Ms. Powell's case, the state attorney moved for directed verdict upon several grounds, one of which was that Ms. Powell failed to present any evidence from which the jury could find the existence of a "special relationship" creating a duty of care on the part of the state attorney's office. The motion was renewed at the close of all the evidence. On both occasions, the trial court denied the motions. We conclude those rulings were in error.
"[A] court must find no liability as a matter of law if either (a) no duty of care existed, or (b) the doctrine of governmental immunity bars the claim." Kaisner v. Kolb, 543 So.2d 732, 734 (Fla. 1989) (emphasis in original). The state's waiver of sovereign immunity in section 768.28, Florida Statutes, does not create new duties of care. Kaisner, 543 So.2d at 733 (citing Trianon Park Condo. Ass'n v. City of Hialeah, 468 So.2d 912, 917 (Fla. 1985)). Thus the initial issue for this court's determination is whether the state attorney's office owed a common law or statutory duty of care to an individual under these or similar circumstances.

COMMON LAW DUTY OF CARE
Ms. Powell argues that because the state attorney's office had advance knowledge of her need and repeated requests for protection and because they compelled her, by subpoena, to be in the same place at the same time as Whylly, the evidence was sufficient to demonstrate a special relationship giving rise to an actionable duty of care to assure Ms. Powell's safety. We disagree because we discern no duty, under the circumstances of this case, that required personnel in the state attorney's office to undertake any affirmative steps to protect Ms. Powell when she appeared at the courthouse pursuant to a subpoena.
Prosecutors, like judges and arresting officers, are law enforcement officials. Trianon Park Condo. Ass'n v. City of Hialeah, 468 So.2d 912 (Fla. 1985). It is well established that a law enforcement officer's duty to protect citizens is a general duty owed to the public as a whole. Everton v. Willard, 468 So.2d 936 (Fla. 1985). A common law duty of care owed to an individual, however, arises in certain circumstances where a special relationship exists between the governmental unit and the individual. This special relationship can exist when a governmental entity places an individual in custody or when a governmental entity undertakes the responsibility to protect an individual. Kaisner, 543 So.2d at 734; Everton, 468 So.2d at 938.
Our supreme court, in Kaisner, found that a common law duty of care existed when an individual was injured while law enforcement officers detained him at the edge of the roadway. The court found that Kaisner was sufficiently restrained of liberty to be in the custody or control of the police when he was ordered to the roadside, was not free to leave, and was deprived of his normal opportunity for protection. The court concluded "that `custody' need not consist of the formal act of an arrest, but can include any detention" and that an individual is owed a common law duty of care when he is placed in some sort of "custody." Kaisner, 543 So.2d at 734.
We conclude that the action of the state attorney's office in issuing the subpoena did not give rise to the special relationship of custody created in Kaisner. Under the facts of the instant case, there was no custody. Ms. Powell was never detained. As a matter of fact, she was injured outside the courthouse before she had checked in with the assistant state attorney. Thus a special relationship of custody did not exist to create a duty of care.
In Everton, our supreme court recognized that a special relationship may exist when, for instance, the police undertake the responsibility to protect a particular person who is placed in danger because they are aiding the police in a criminal case. 468 So.2d at 938. The court acknowledged that when the police assume this responsibility *1184 to protect an individual, they have a special duty to use reasonable care in providing that protection. The state attorney's office could have a similar duty to use reasonable care in providing protection to an individual if they voluntarily undertake that responsibility.
Under the facts of the instant case, viewed in the light most favorable to Ms. Powell, the state attorney's office did not undertake the responsibility to protect Ms. Powell. Ms. Powell presented to the trial court no evidence establishing either that the state attorney's office told her that they would protect her or that they took affirmative steps to provide her with protection.
Furthermore, Michael Benito, a felony division chief at the state attorney's office, testified that it was not office policy to provide protection for witnesses, even though many times witnesses are fearful that they may be in danger from defendants who are out on bond. The state attorney's office can tell them only that they have the right to protect themselves. The investigators are used primarily to serve subpoenas on witnesses; they are not used in a law enforcement capacity. On the other hand, Benito testified that although he had never used an investigator to transport a witness to court, it could be accomplished provided there was the necessary manpower.[2] Benito acknowledged, however, that it was extremely common for witnesses to be threatened, especially in domestic situations.
Schultz, who was handling the probation revocation proceeding against Whylly, testified that he had no authority to offer protection to anyone. He testified that if he had been confronted with this situation, he would have consulted with his superiors who "would have referred the matter over to the Tampa Police Department."
We conclude, based on the above, that a special relationship did not exist to create a common law duty of care owed to Ms. Powell by the state attorney's office. The state attorney's office did not assume a duty of care by undertaking the responsibility to protect Ms. Powell. Thus the special duty to use reasonable care in providing protection recognized in Everton did not arise in this case.
There may be a case in which the facts establish a relationship sufficiently special to create a duty owed to a witness by a state attorney. However, the facts of this case do not establish that duty. Taking the evidence in the light most favorable to Ms. Powell, all that the state attorney's office knew about the danger to Ms. Powell was: (1) Whylly sent threatening letters to Ms. Powell which initiated an investigation; (2) Whylly would not let Ms. Powell into the courtroom at the first scheduled hearing on the violation of probation charge; and (3) on July 9, 1981, Ms. Powell told a lady answering the telephone at the state attorney's office that her husband had threatened her and that she was scared, and the lady insisted that Ms. Powell respond to the subpoena. We conclude these facts do not establish any special relationship creating a duty of care upon the state attorney's office.
We have not overlooked the language in Kaisner which states as follows:
There is a strong public policy in this state that, where reasonable men may differ, the question of foreseeability in negligence cases should be resolved by a jury. Where a defendant's conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses.
Kaisner, 543 So.2d at 735 (citations omitted). However, we conclude that the actions of the state attorney did not create a foreseeable zone of risk for which they owed a duty to Ms. Powell. We conclude that the issuance of a subpoena to a witness *1185 to attend a court hearing, even when a witness has reason to be fearful and notifies the office issuing that subpoena of her fears, does not create a duty to protect or arrange protection for the witness upon one issuing that subpoena.

STATUTORY DUTY OF CARE
Finally, our research reveals that there is no statutory duty of care. We do not minimize the serious injuries suffered by Ms. Powell. However, the legislature must create a new duty upon a state attorney to permit a plaintiff under similar circumstances to recover. See Everton, 468 So.2d at 939.
Reversed and remanded with directions to grant a directed verdict in favor of the state attorney's office.
SCHOONOVER, C.J., and RYDER, J., concur.
NOTES
[1] The trial court granted summary judgments in favor of the Sheriff of Hillsborough County and the City of Tampa, and subsequently entered a judgment in favor of the City. However, in order to avoid piecemeal appeals, the court vacated the judgment.
[2] E.J. Salcines, the state attorney for the Thirteenth Judicial Circuit in 1981, testified that during 1981, the state attorney's office handled 50,000 new cases with each assistant state attorney's annual case load at approximately 1,000 cases. He further testified that the office employed only seven investigators.